BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**HELEN L. COOPER, OSB #871957**
helen.cooper@usdoj.gov
**GAVIN W. BRUCE, OSB # 113384**
gavin.bruce@usdoj.gov
Assistant United States Attorneys
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401-2708
Telephone:  (541) 465-6771
Facsimile:   (541) 465-6917
Attorneys for the United States

### UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:16-CR-00187-MO |
| v. | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **JAMIE FAYE COBAT,** | |
| Defendant. | Sentencing: Wednesday, August 23, 2017, 11:00 a.m. |

The United States of America, by Billy J. Williams, United States Attorney for the District of Oregon, through Helen L. Cooper and Gavin W. Bruce, Assistant United States Attorneys, hereby submit the following in support of the Government's sentencing recommendation.  The government is recommending a sentence of 24 months' imprisonment and a three-year term of supervised release along with the standard and special conditions of supervision recommended in the pre-sentence report.  The government is also seeking a restitution order in the amount of $27,917, as well as a forfeiture judgment of the same amount.

**PROCEDURAL SUMMARY**

Defendant was initially indicted in April of 2016 for the theft of welfare related to defendant's claim that her son lived with her. Subsequent investigation led to the addition of the wire fraud charge and the forfeiture allegation so the charges would include defendant's fraudulent conduct related to her own disability benefits. Defendant proceeded to trial April 4-6, 2017, and was found guilty by the jury on all counts. Defendant waived presentation of the forfeiture count to the jury and elected to have the forfeiture judgment decided by the Court.

Defendant comes before the Court for sentencing on one count of wire fraud and three counts of theft of government funds. The government will present a forfeiture order for the Court's signature at the time of sentencing.

Defendant's trial counsel has since withdrawn and defendant has advised the Court that she wishes to proceed pro se.

**FACTUAL SUMMARY[1]**

**The Investigation**

In 2005, the Social Security Administration (SSA) granted defendant's son, Bryce (Identified as "B.R." in the indictment) Supplemental Security Income (SSI) benefits, based on a medical condition and defendant's financial need. Because Bryce was then 7 years old, defendant applied to be Bryce's Representative Payee to receive the SSI benefits on Bryce's behalf. As Bryce's Representative Payee, SSA advised defendant of her reporting duties and responsibilities including reporting to SSA if Bryce's medical condition improved, he moved, or

---

[1] The government is confident the Court recalls the facts of the case as presented at trial, however the factual summary is included here for the record as well as to include information that was not presented at trial.

the household's resources or composition changed.  SSA also advised defendant that Bryce's SSI was solely to be used for Bryce's care and support.

Between 2012 and 2014 defendant submitted three Representative Payee annual reports to SSA stating that Bryce had continued to reside with her, and that she had spent all of Bryce's SSI for his care and support.

In 2014, SSA received a fraud referral from defendant's ex-husband Robert Ramsey.  Ramsey advised SSA that Bryce had been residing with him in Albany since at least August of 2012, when defendant began residing with Tim Fox, a convicted sex offender.  Fox was on post-prison supervision and prohibited from contact with minors, including Bryce.  In August 2012, Bryce was 14 years old.  Ramsey told SSA that he had been supporting Bryce since August of 2012, and that defendant had not provided him or Bryce with any of Bryce's SSI funds.  Based on Ramsey's allegation, this criminal investigation ensued.

SSA Office of Inspector General Special Agent Dale Boring conducted further investigation including verifying Tim Fox's criminal history, his release from prison in August 2012, and his prohibition of contact with minors.  He also verified that defendant had married Fox in August of 2014.  He interviewed Robert Ramsey and his son Bryce, and Bryce confirmed that other than occasional grocery and clothing purchases and infrequent cash gifts, defendant had not provided Bryce his SSI benefits.

Agent Boring further determined that in addition to receiving Bryce's SSI, defendant had been on some form of public assistance since at least 1997, including Supplemental Nutrition Assistance Program (SNAP) benefits, commonly known as food stamps.  Defendant had also received Temporary Assistance to Needy Families (TANF) benefits based on defendant's claim that Bryce had no contact with his father.  Both SNAP and TANF are federal, needs-based,

welfare benefits administered by the Oregon Department of Human Services (DHS), and require truthful disclosure of the applicant's income, resources, household composition, and marital status. Defendant made similar statements to DHS between August 2012 and November 2014, that Bryce was residing with her, and did not inform SSA or DHS that she and Tim Fox were living together as a couple or had married.

Agent Boring and DHS fraud investigator Karlene Austin contacted defendant in November 2014 at her residence in Redmond. Their interview of defendant was audio recorded. When confronted with her concealment of Bryce's true living arrangement, defendant stated that because she still had legal custody of Bryce, she did not believe she was untruthful with SSA when she stated that Bryce lived with her. When reminded that SSA required Bryce's SSI to be used solely for Bryce's care and support, she claimed she maintained a bedroom for him and paid 25% of his SSI each month towards her rent, and that the "rest goes to Bryce". She also claimed that Robert Ramsey "stole" Bryce from her; that Ramsey had "brainwashed" Bryce; that Bryce did not want to live with her because he did not want to follow rules; and that she and Tim Fox have gone "back and forth" between Redmond and their Lebanon residence since 2012. Defendant also stated that Bryce's father makes too much money for Bryce to be eligible for SSI.

Agent Boring interviewed Linn County Parole and Probation (LCPP) officers Cliff Filley and Jason Eddie. Filley and Eddie advised they supervised Fox while Fox was on post-prison supervision between August 2012 and February 2016. Their records show Filley contacted defendant at her and Fox's residence in Lebanon, Oregon, on September 19, 2012. Defendant advised Filley that no minors were present when Fox was home and that her children were not present due to Fox's restrictions. Defendant confirmed that she knew Fox was not to have any contact with minors. LCPP records show that Fox continuously reported living with defendant,

and repeatedly reported he had had no contact with minors. During his term of post-prison supervision, Fox was never granted permission to have contact with Bryce despite his and defendant's repeated requests for a "safety plan". Additionally, Fox's monthly reports to LCPP regarding his household composition and income conflict with information defendant provided to DHS.

SSA records show that SSA assessed overpayments on defendant in 2008 and 2011, based on defendant inaccurately reporting resources information to SSA. On both occasions defendant appealed the overpayment assessment. DHS records show that DHS received several fraud referrals regarding defendant prior to 2012. As a result, the social workers frequently questioned defendant about the accuracy of information she was providing to DHS.

DHS records show that Tim Fox applied for SNAP benefits in January 2013, and provided information to DHS regarding his address and household composition through May of 2015. The information he provided on his applications is at times in direct conflict with information defendant provided to DHS.

On May 11, 2016, during an eligibility interview for defendant's application for her own SSI benefits, defendant told SSA that she was paying rent to Carrie Fox[2], that Bryce was residing with her, and that she and Fox had never lived together as husband and wife.[3] As a result of these statements to SSA, defendant was awarded Title XVI SSI benefits in addition to Title II disability benefits, and was advised she would receive an SSI back-payment in the amount of

---

[2] Carrie Fox is Tim Fox's ex-wife, testified at trial and denied being defendant's Landlord, other than a brief time in 2012 when defendant rented a room from her while Fox was in prison.
[3] Two weeks later, defendant would tell U.S. Pre-Trial Services that she and Fox had resided together continuously since 2012.

Government's Sentencing Memorandum
Page 5

$16,799. Defendant subsequently opted to not take the SSI benefits in order to facilitate a faster release of her $26,245 Title II disability back-payment.

Between August 2012 and November 2014, defendant received $19,247 in Bryce's SSI, $2,845 in TANF, and $5,825 in SNAP benefits. Therefore, the actual total loss is $27,917, and the intended loss is $44,716.

Defendant was initially charged in April of 2016, with three counts of theft of government funds related to the benefits received based on her false statements regarding Bryce being in the household. After further investigation revealed defendant's false statements related to her own SSI application in May of 2016, the government sought the superseding indictment with the additions of the wire fraud charge and the forfeiture allegation.

**Post Indictment and Trial**

In June of 2016, defendant made claims to SSA that she was in dire need of funds and requested an advance payment of her $26,245.50 back-payment for her recently-approved disability benefits. After requiring defendant to sign a statement under penalty of perjury that she would immediately repay any overpayment, the Albany SSA field office issued defendant an immediate payment of $999, and a payment of $9,999 from SSA's Critical Payment System. A few weeks later, SSA's disability payment center issued defendant a check in the full amount of the $26,245.50 back-payment without withholding the $10,998 that had been advanced to her. Defendant failed to return the overpayment. Defendant was not charged with any crime related to her receipt of this overpayment.

After her indictment and prior to trial, defendant contacted at least one congressional office to complain about her fraud charges. She asserted that the welfare agencies were at fault.

After learning that Bryce may be a government witness, defendant sent numerous text messages to Bryce telling him that he had to "step up" like his siblings and assist her with the criminal charges, and that, "It's sad that u are afraid to help me." When the government learned of the nature of defendant's communications to Bryce, the government requested that defendant have no contact with Bryce without the approval of Pre-Trial Services. Judge You imposed this no contact condition in October of 2016.

At trial, Bryce was called as a government witness on behalf of the government. His testimony changed slightly from his previous statements to the investigators, but for the most part was consistent. He had provided a letter for the defense as requested by his mother.

Prior to trial, the parties litigated numerous evidentiary issues wherein defendant sought to introduce evidence of her dysfunctional relationship with Bryce's father and Bryce's medical history, which the government argued was irrelevant. The court allowed in part defendant's evidence.

Defendant testified at trial. She again claimed that since she had legal custody of Bryce she was entitled to claim he was in her household and to keep his SSI benefits. She testified that she maintained a bedroom for him in both Lebanon and Redmond, and that Bryce was "a little confused" when he testified that he saw her only once or twice a week when she lived in Lebanon, and even less when she moved to Redmond. She also testified that DHS social worker Rebecca Hernandez was incorrect in her testimony regarding the circumstances surrounding the issuance of an April 2012 letter; that SSA Claims Specialist Jeffrey Holmes mistakenly wrote down the wrong name for her Landlord; that Linn County Parole and Probation officer Cliff Filley was incorrect in his testimony that she shared a bedroom with Tim Fox; that her ex-husband "stole" Bryce from her; that liquor store and Victoria's Secret purchases on Bryce's SSI

debit card were for soda and ice and cologne for Bryce; and that her attempted withdrawal of $150 at Harrah's Casino in Las Vegas was because she had already provided Bryce with cash and was paying herself back.

**Post Trial**

Defendant has continued to dispute her fraudulent receipt of benefits and has made repeated phone calls and office visits to SSA and DHS.  Defendant has continued to file complaints with congressional offices requiring SSA to respond to numerous Congressional Inquiries.  Defendant has also filed documents with the agencies and the court claiming that her debts have been paid in full from an account held for her by the U.S. Treasury.  Defendant also left at least one voicemail message for an SSA employee threatening to hold the employee personally responsible for not providing defendant with a letter stating her debt was paid, and that she is tired of the "lies, deceit and corruption" of the SSA office. (This voicemail recording will provided to the court prior to sentencing and marked as Exhibit 1.)  SSA has since issued defendant a Ban letter, prohibiting her from entering any Social Security office due to defendant threatening SSA staff by stating, "you will regret this you capital letter (explicit.)"  Exhibit 2.  SSA has also imposed 42 months of Administrative Sanctions[4] for defendant's refusal to repay the $10,998.00 overpayment related to the advance payment to her in July of 2016.  Defendant filed a request for reconsideration in May of 2017, which SSA has denied.

/ / /

---

[4] Any monthly benefits defendant is entitled to receive (such as her Title II disability benefits) will be withheld for 42 months.  This is for the loss to SSA involving defendant's disability benefits and is separate from the $19,247 loss to SSA for the instant offense involving the fraudulent receipt of Bryce's Title XVI SSI benefits.

Government's Sentencing Memorandum
Page 8

## GUIDELINES CALCULATION

The government agrees with the guidelines calculation in the Pre-Sentence Report. Defendant's Base Offense Level for wire fraud and theft of government funds is seven, with a six-level enhancement for an intended loss of more than $40,000, but less than $95,000. Two-level enhancements for both abuse of trust and obstruction of justice are warranted, resulting in a Total Offense Level of 17, and a sentencing range of 24-30 months' imprisonment.

## ARGUMENT

### The Sentencing Guidelines' Range is Appropriate

The Supreme Court has held that there is no rule that requires an "extraordinary circumstance" to justify a sentence outside the guideline range. *Gall v. United States*, 128 S. Ct. 586, 595 (2007). Nevertheless, the Court in *Gall* recognized that the guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentence decisions." Id. at 594.

Even though the guidelines are advisory rather than mandatory, the district court must begin all sentencing proceedings by calculating the applicable guideline range. Id. at 596. See *Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007) ("District Courts must treat the Guidelines as 'the starting point and the initial benchmark.'")  Here, a sentence within the guideline range of 24-30 months' imprisonment is appropriate.

### Repetitive Nature of the Offense

It is significant to note that this guideline calculation does not include the repetitive nature of defendant's fraud and theft. This case was not a result of a few acts by defendant that resulted in a $27,917 loss. This case involves the repeated theft of benefits paid each month between August 2012 and November 2014. Each month, or 26 times, defendant converted

Bryce's SSI funds to her own use.  This case also involves numerous false statements to SSA and DHS.

**Victim Impact**

The guidelines calculation does not take into account the full victim impact of defendant's conduct.  That is, the guideline range of 24-30 months' imprisonment is primarily driven by the amount of benefits paid to defendant and the SSI benefits she attempted to receive on her own behalf, for a total of $44,716.  The calculation does not include the valuable human resources of the welfare agencies that defendant has used and wasted because of her incessant calls to the social workers and demands on the welfare agencies.  As noted in the timeline below and defendant's conduct since being indicted and convicted, defendant has been a substantial burden to these agencies.  Time the social workers could be spending on other applicants has been used on defendant.

**Obstruction Enhancement**

The Pre-Sentence Report assesses the two-level obstruction of justice enhancement for defendant's acts of obstruction.  Pursuant to U.S.S.G. §3C1.1, this enhancement is appropriate if defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction.    Here, the enhancement is warranted for defendant's attempt to manipulate a witness, her repeated filings of frivolous appeals and complaints with welfare agencies and congressional representatives, and her perjured testimony at trial.

Following her indictment and review of the discovery, defendant sent numerous text messages to Bryce telling him he had to write a letter in her defense.  Although defendant will

likely argue she was simply trying to secure what she considered truthful testimony, defendant's messages went further.  For example:

"My lawyer told me today you are a witness for the State."

"I'm your mom and I've bent over backwards to help, and all I ask is for you to step up like your siblings are. It's sad that you are afraid to help me."

"It breaks my heart to see this go on."

"If Robert (Ramsey) wouldn't have written that letter full of lies, none of this would be going on."

"[Y]our dad is using you to play his game. I'm sorry, I'm pretty pissed off that he has no regard for you."

"You are simply in this due to your dad involving you,"

After not responding to numerous messages, Bryce replied:

 "I don't want to talk about it. I'm tired of being involved."

Yet the following morning, defendant continued with more text messages:

"Are you coming by before I leave? I mean it, Bub. It's the only thing going to keep me from being put away. This is seriously a big deal. Don't ignore this, please. Hello, hello, knock, knock. You have to write a letter telling all of it. Bryce, what's going on? Why are you ignoring me? It seems like ever since this court crap, you have moved out and I hardly speak to you. This court thing needs to be resolved pretty fast. It seems all my kids are here to help with this any way they can. I hope you, too, are on board."

      The content of the text messages was sufficiently inappropriate and concerning that Judge You ordered the defendant to have no further contact with her son without the approval of pre-trial services.  According to the Commentary of §3C1.1, an example of conduct covered by the enhancement is threatening, intimidating, or otherwise unlawfully influencing a witness, or

Government's Sentencing Memorandum
Page 11

attempting to do so.  (See Application Note 4A.)  Defendant's messages to Bryce qualify as such conduct.  As previously noted, defendant presented a letter from Bryce at trial.

The court could also impose the obstruction enhancement if it finds that defendant committed perjury. *See United States v. Castro-Ponce*, 770 F.3d 819, 822 (9th Cir. 2014). To do so, the district court must find that: "(1) the defendant gave false testimony, (2) on a material matter, (3) with willful intent." *United States v. Castro-Ponce*, 770 F.3d 819, 822 (9th Cir. 2014).  Defendant's testimony was rife with lies.  Her explanation for the debit charges at Victoria's Secret, nail salons, and liquor stores was absurd.  Additionally, her statements that she and Tim Fox did not live together were in direct conflict with years of written records signed by defendant and Tim Fox to welfare agencies and probation offices.  Her claim that the SSA Claims Specialist mistakenly wrote down "Carrie Fox" when in fact she told him "Tim Fox" was beyond unbelievable.  This testimony was as to how she spent the funds, her household composition, and whether she made false statements to the agencies—all material matters. Clearly her false testimony at trial was with willful intent.

Similarly, defendant's frivolous appeals and complaints to the agencies and congressional representatives involved the same false claims and statements she made at trial on material matters with willful intent.  Defendant's conduct has been, and continues to be, directly intended to obstruct the agencies' administration of justice.

**<u>Abuse of Position of Trust</u>**

U.S.S.G. § 3B1.3 provides that if "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels."   Defendant applied to be the Representative Payee on behalf of Bryce in March of 2005.  She agreed to report truthfully to SSA if Bryce

moved, left her care, or received other assistance.  Between 2012 and 2014, defendant repeatedly filed Representative Payee Annual Reports that advised SSA Bryce resided with her and concealed the care he was receiving from his father.  During a redetermination of eligibility interview in October 2014, defendant advised SSA that Bryce continued to live with her.  Based on these statements and concealments by defendant—the person entrusted to manage Bryce's SSI and truthfully report to SSA—the benefits continued to be paid.  Defendant abused this position of trust granted to her by SSA and the two-level enhancement is warranted.

**Timeline of Events**

Defendant has been on some form of public assistance since 1997.  Although the actual loss amount in the instant offense only involves benefits paid between August 2012 and November 2014, defendant's history with the welfare agencies shows repeated instances where social workers and investigators suspected fraud.  The following timeline illustrates this history, defendant's treatment of the social workers, and refutes defendant's arguments that she is somehow an innocent victim of the government agencies.[5]

**1997 – 2011**

1997 – Defendant applies for SSI claiming "panic disorder".  Her application is denied.
March 4, 2002 – DHS receives a "community complaint" that defendant is concealing that Robert Ramsey is in the household.  Branch worker is notified to do a home visit. (1252)
February 13, 2003 – Defendant tells caseworker to do her job and "not be so nosy" when worker tries to inquire who the male was who answered the phone. (1269)
February 13, 2003 – another "investigation referral" made by DHS due to conflicting household information. (1272)
November 8, 2003 -  (Bryce is 5 years old) applies for SSI.  Denied (Bryce's SSI file)

---

[5] The numbers in parentheticals refer to the corresponding page number in discovery.

Government's Sentencing Memorandum
Page 13

2000 – 2003 –Early school records for Bryce show some behavior problems consistent with OCD, but by 2004 the school sees marked improvement.  Defendant stops cooperating with school and evaluators when they start saying he has improved (Bryce's SSI file.)

2004 – Defendant and Robert Ramsey separate

April 26, 2004 – Defendant files a reconsideration request for Bryce's SSI

Between June 21, 2004 and August 9, 2004, defendant repeatedly calls SSA, sometimes twice daily, asking about Bryce's claim.  Told to call weekly instead of daily on August 2, 2004.  Defendant says ok, but then calls on August 3rd and August 6th.

December 27, 2004 – DHS attempts a home visit but Jamie yells and screams and slams the door in their faces.  She tells them to shove a form up their ---. (1326)

January 27, 2005 – DHS fraud investigator and caseworker attempt to discuss a community complaint with defendant, but defendant becomes emotional and blames Robert for fabricating information to try to take Bryce from her.  (1334)

February 10, 2005 – Defendant files a grievance regarding the attempted interview by the DHS fraud investigator. (1342)

July 21, 2005 – letter to SSA from defendant's SSA attorney stating that defendant won't pay his attorney fees and is not returning his calls (Bryce's SSI hard copy file)

July 24, 2006 – Supplemental Judgment modifying Custody – Defendant awarded "sole custody" – Order full of do's and don'ts including that defendant is prohibited from using Bryce's identity for credit purposes

October 21, 2008 - SSA assesses an overpayment in the amount of $1,414.65 for not accurately reporting resources or income (request for waiver denied) (54-59)

April 15, 2010 – defendant applies for own disability benefits – claiming multiple physical and mental impairments.

May 24, 2011 – SSA assesses an overpayment in the amount of $2,585 for not accurately reporting resources or income (70-76)

**2012**

April 12, 2012 – Defendant asks DHS how her benefits would be affected if Bryce lived with his father.  She is advised her TANF would stop and (without his SSI) her food stamps would increase $6  (1538)

June 2012 – Tim Fox released from prison, then county jail through August (975-979)

August 6 2012  LCPP "leave a note" from Cobat inquiring how long approval process will take (2279)

August 2012 – Bryce goes to live with dad

August 28, 2012 – Stipulated 3rd sup judgment modifying parental time – refers to March 30 and May 18, 2012 hearings, but not signed until August 2012. (i.e. by the time this order is signed, Bryce is living with his dad.)  Orders that defendant still has sole custody, but parents have 50/50 parenting time to alternate every 2 weeks.(Attorney Vergamini represents def.)

October 4, 2012 – Defendant tells DHS that "for some reason" she owes support to Robert now. As a result, DHS increases her benefits (1547 TRACS)

December 4, 2012 – Fox asks probation for permission to have contact with girlfriend's son, (2245)

**2013**

January 28, 2013 – Defendant sends Rep Payee report to SSA and claims Bryce lived w/ her between October 2011 and September 2012 (84-85)

April 1, 2013 – Debbie and Toby Brown begin renting Mayfly residence

April 30, 2013 – Defendant tells DHS Tim Fox LL & they live together on Mayfly, but are just friends, does not disclose any financial help, and claims Robert Ramsey is an "absent father". (165-173)

May 13, 2013 – DHS finds there is no parental deprivation for Bryce (no TANF anymore) based on defendant's statement that Bryce seeing dad after school every day (1554)

July 24, 2013, Fox receives notice from VA that he will be receiving monthly benefits – approx. $1,400/month (1150)

October 18, 2013 – defendant tells DHS she & Bryce on Nickernut and pays $700 rent to Tim Fox, says Robert is absent parent who stopped living with Bryce in 2005,

November 25, 2013 – Fox's monthly report says living w/ defendant (2293)

December 10, 2013 – Fox tells DHS he lives by himself on Nickernut, discloses $1400 month VA benefits

**2014**

January 3, 2014 – Fox monthly report says living w/ defendant (2296)

January 10, 2014 – J. Luukinen signs Interim order of Parenting Time and Suspension of Child Support.  References parties had binding settlement conference on November 12, 2013.  **Orders child support suspended, defendant allowed to relocate to Deschutes County, and that Bryce shall reside primarily with father until July 1, 2014 and remain in school in Albany; No contact with Tim Fox allowed.**  Def given approximately 23 days of visitation between January 2014 and July 2014.

February 28, 2014 – defendant added to Fox's OSU FCU account (VA account)

March 29, 2014 – Rep Payee report to SSA saying Bryce resided w/ her October 2012-September 30, 2013 (included address change info to Mayfly) (86-87)

May 18, 2014 (received by DHS June 9, 2014) – Fox's application to DHS for SNAP – Redmond address, doesn't disclose anyone else in HH, says no one else w/ any income (doesn't disclose Jamie getting Bryce's SSI)

July 28, 2014 – Fox monthly report – living w/ defendant on Nickernut (2231)

August 28, 2014 – Attorney Vergamini tells Brown's attorney he is representing Tim Fox in Brown vs. Fox, civil lawsuit involving defendant and Fox's tenants.

August 30, 2014 – defendant and Fox married

September 4, 2014 - $500 payment to Vergamini from Bryce's SSI benefits

September 12 – September 29, 2014 – Dates for probation-approved trip to Vegas  for 17 days.

October 15, 2014 – Defendant has phone interview w/ DHS.  Says Bryce in HH.  Does not disclose Fox or Fox's VA benefits.

October 17, 2014 – Defendant does not report marriage to DHS & checks "divorced" on app

October 27, 2014 – Rep payee report, defendant claims Bryce resided w/ her October 2013-September 30, 2014, (88-89)

October 31, 2014 – Defendant does an eligibility interview over the phone w/ SSA, says Bryce residing with her, he doesn't get any help from anyone, says has no bank account (doesn't disclose OSU FCU acct w/ husband Fox) (90-97)

November 25, 2014 – Defendant contacts DHs and says she feels she is being "harassed" by DHS and wants her benefits closed.  SNAP closed effective November 30, 2014. (252)

**2015**

January 2015 – Def and Fox back on Mayfly.  Jason Eddie PO does home visit

March 25, 2015 – DHS sends Def overpayment notice

**2016**

April 26, 2016 – ALJ awards defendant disability benefits, but recommends a determination be made whether she needs a rep payee due to her claims of impairments (1015-1022)

May 9, 2016 – defendant makes false statements to SSA, Jeffrey Holmes – doesn't disclose VA income, says doesn't live w/ husband, says Bryce lives w/ her, says paying rent to Carrie Fox, (987-1012) Holmes sends her forms to sign and return because he suspects she is not being truthful.

May 11, 2016 – Defendant signs form under penalty of perjury that she and Fox have never lived together as husband and wife and that daughters loaned her money.

May 23, 2016, Monday – defendant served with indictment and summons

May 25, 2016 – SSA sends notice to defendant advising she will be getting $733 per month in SSI, and a $16,799 back payment (1023)

May 27, 2016 – defendant tells SSA she does not want SSI after all (1013)

March – July 15, 2016 – "Remarks" in SSA records note numerous calls from defendant inquiring about her money

June 13, 2016 – Def arraigned on first indictment.  Tells PTS that she and Fox have lived together on Mayfly since 2012

June 27, 2016 – receives cash advances (Both $999 or $9,999), claims her home is about to go into foreclosure

July 25, 2016 – cashes $26,000 check

**3553(a) Factors**

The factors the Court shall consider in imposing a sentence include the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and to

Government's Sentencing Memorandum
Page 17

provide just punishment for the offense. The sentence should also afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant.

The nature and circumstances of the offense was serious and ongoing for years. Defendant repeatedly lied to social workers and manipulated the welfare system. Although this is her first criminal conviction, defendant had prior overpayments with SSA that were resolved administratively. In other words, defendant simply had to pay the money back with no other consequences. A sentence that does not include a significant term of incarceration would essentially be the same "punishment" that has been imposed on her in the past. Such a penalty failed to have any deterrent effect with this defendant.

Additionally, a sentence of incarceration will promote respect for the law and will be a message to the welfare agencies that their work is important and supported by the Court. Anything less than a term of incarceration would send the wrong message to the public.

The government is unaware of any positive characteristics of defendant. Defendant's actions prior to indictment, while the case was pending, and since trial have been obstructive, rude, and criminal. Defendant's deliberate acts of leaving berating voicemail messages for the social workers, hanging up on them, cursing at them, and slamming the door in their faces is a troubling illustration of defendant's nature. Defendant has been a social worker bully for years.

Defendant has failed to show any remorse for her criminal acts or make any efforts towards remediation. In fact, her acts are quite the opposite as she continues to dispute her guilt, file frivolous claims, complain to Congress, and abuse social workers.

/ / /

/ / /

## RESTITUTION

Restitution is mandatory and the government requests the court order restitution in the amount of $27,917, payable as follows:

Social Security Administration
Debt Management Section
ATTN: Court Refund
PO Box 2861
Philadelphia, PA 19122
**Amount: $19,247**

Department of Human Services
Overpayment Recovery Unit
PO Box 14150
Salem, OR 97309
**Amount: $8,670**

## CONCLUSION

For all the reasons noted above, the government recommends a sentence of 24 months' imprisonment, restitution and forfeiture orders in the amount of $27,917 each, a three-year term of supervised release, and the special and general conditions of supervision recommended in the Pre-Sentence Report.

Dated this 16th day of August 2017.

                Respectfully submitted,

                BILLY J. WILLIAMS
                United States Attorney

                *s/ Helen L. Cooper*
                HELEN L. COOPER
                Assistant United States Attorney

                *s/ Gavin W. Bruce*
                GAVIN W. BRUCE
                Assistant United States Attorney