**Mark Ahlemeyer, OSB No. 095997**
**Assistant Federal Public Defender**
Email: mark_ahlemeyer@fd.org
101 SW Main Street, Suite 1700
Portland, OR  97204
Tel: (503) 326-2123
Fax: (503) 326-5524

**Attorney for Defendant**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 3:16-cr-187-MO-1 |
| Plaintiff, | MOTION FOR A NEW TRIAL |
| v. | *HEARING REQUESTED* |
| **JAMIE FAYE COBAT,** | |
| Defendant. | |

    The defendant, Jamie Faye Cobat, through her attorney, Mark Ahlemeyer, respectfully moves the Court for a new trial based on the government's violation of her Fifth Amendment right to due process under the United States Constitution.  Specifically, as developed below, a new trial is warranted because the government failed to produce to the defense exculpatory evidence that was material to the case.  Alternatively, a new trial is warranted under the Sixth Amendment because Ms. Cobat received constitutionally ineffective assistance of counsel.

**BACKGROUND**

On April 26, 2016, Ms. Cobat was indicted on three counts of Theft of Government Funds in violation of 18 U.S.C. § 641. CR 1. The counts alleged that Ms. Cobat had stolen or converted United States-funded benefits in the following amounts: $18,197 from Supplemental Security Income (SSI), $2,845 from the Temporary Assistance to Needy Families program (TANF), and $5,825 from the Supplemental Nutrition Assistance Program (SNAP). *Id.*

On October 5, 2016, the government filed a superseding indictment charging Ms. Cobat with engaging in an overall scheme to defraud the government in violation of 18 U.S.C. § 1343 (Count 1). CR 16. The three substantive counts of theft were also charged in the new indictment (Count 2 – SSI; Count 3 – TANF; Count 4 – SNAP). *Id.*

Pretrial hearings were held on March 24, 2017, and April 3, 2017. CR 80, 81. The case proceeded to trial on April 4, 2017. CR 82. The government's primary theory of the scheme to defraud and the substantive theft counts was that Ms. Cobat intentionally failed to report that her son, Bryce, lived with his father. CR 43 at 1-3. According to government witnesses—state and federal employees and investigators—(1) Bryce was ineligible for SSI disability benefits if he lived with his father and therefore, Ms. Cobat should not have received benefits as his representative payee; (2) Ms. Cobat was ineligible for TANF benefits if Bryce was not living with her; and (3) Ms. Cobat's SNAP benefits would have been reduced had she reported that Bryce did not live with her. The government also alleged additional misstatements by Ms. Cobat to support the fraud count, such as providing incorrect information about her relationship with Tim Fox.

The defense argued Ms. Cobat lacked criminal intent and that any deficiency in reporting was either made in good faith or resulted from miscommunications with agency staff. The defense also attacked the integrity of the government's investigation and argued that the prosecution was

not based on a reasoned evaluation of the evidence, but rather was the result of a rush to judgment based on information provided by Ms. Cobat's vindictive ex-husband.[1] On April 6, 2017, the jury convicted Ms. Cobat on all counts. Tr. at 430-32.

On June 6, 2017, Ms. Cobat's retained counsel filed a motion to withdraw from the case. CR 86. The Court granted that motion (CR 87), and Ms. Cobat appeared to proceed toward sentencing pro se. Ultimately, the Court continued the sentencing hearing to allow Ms. Cobat to seek appointed counsel. On September 1, 2017, undersigned counsel was appointed to represent Ms. Cobat. CR 116. A new sentencing hearing was scheduled for November 1, 2017. CR 114.

On October 19, 2017, undersigned counsel moved to continue the sentencing based on a need for additional time to investigate the case and to prepare for sentencing. CR 120. A new sentencing hearing was set for January 5, 2018. CR 121. In preparation for that hearing, undersigned counsel reviewed the discovery and trial transcripts to assess the accuracy of the alleged loss amounts. While bank records related to SSI deposits were produced in discovery and offered at trial, it did not appear that similar records for TANF and SNAP benefits were provided to the defense or offered to the jury. Indeed, the lack of those records led defense counsel at trial to argue for a motion for a judgment of acquittal to the Court and to argue for acquittal based on reasonable doubt to the jury. Tr. at 274-78, 396-97. During its deliberations, the jury directed its only question to exactly that issue: "Is there a document that specifies the total amount of SNAP and TANF received during July 2012 to October 2014?" Tr. at 429.

---

[1] The ex-husband's report to SSA makes clear that he was seeking to become Bryce's representative payee. Government Discovery at 27 ("I am writing to you concerning changing the payee for Bryce."); *id.* at 28 ("Bryce deserves me to be the payee for his benefits . . . "). Apparently, he did not know what the government alleged Ms. Cobat knew: that Bryce would be ineligible for SSI benefits if he lived with his father.

Page 3   MOTION FOR A NEW TRIAL

Undersigned counsel has now secured the TANF and SNAP deposit records, which were in the possession of the Oregon Department of Human Services (DHS). Those records, attached as Exhibit A, and two corroborating documents (Exhibits B and C), are the basis of the current motion for a new trial pursuant to the Fifth Amendment Due Process Clause. To allow for briefing, an evidentiary hearing, or other proceedings the Court may deem appropriate, the defense has also filed a Motion to Strike the current sentencing date.

## ARGUMENT

I. **The United States Constitution Requires A New Trial In This Case Because The Government Failed To Disclose Exculpatory Evidence That Was Material To The Defense.**

   A. **Due Process Requires The Government To Disclose Favorable Material To The Defense.**

In the seminal case *Brady v. Maryland*, the Supreme Court held that the government violates due process when it fails to produce evidence that is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The *Brady* requirement covers both exculpatory and impeachment evidence. *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)); *accord Giglio v. United States*, 405 U.S. 150, 152-54 (1972). The government has a duty to produce such material, regardless of whether it is requested by the defense. *Id.* (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). Moreover, the *Brady* rule requires "the individual prosecutor . . . to learn of any favorable evidence known to the others acting on the government's behalf." *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). Due process is violated even if the prosecutor did not have personal knowledge of the favorable material and even if the government's

failure to produce it can be characterized as an "innocent" mistake. *United States v. Price*, 566 F.3d 900, 907-08 (9th Cir. 2009).

Where favorable material has not been disclosed to the defense, a new trial is required if the defense is prejudiced as a result. *Id.* at 907. "The touchstone of [the prejudice analysis] is whether admission of the suppressed evidence would have created a 'reasonable probability of a different result.'" *Id.* at 911 (quoting *United States v. Jernigan*, 492 F.3d 1050, 1053 (9th Cir. 2007) (en banc)) (alteration in original). This is a lower standard than preponderance of the evidence. *Id.*

### B. The Government Failed To Disclose Exculpatory TANF Deposit Records That Were In Its Possession.

The government alleged, both as part of an overall fraudulent scheme and as a specific act of theft, that Ms. Cobat intentionally receieved $2,845 in TANF benefits that she was not entitled to from September of 2012 to May of 2013. CR 16. Both a DHS Case Manager and a DHS Criminal Investigator testified at trial as to Ms. Cobat's receipt of TANF funds. Tr. at 143-59 (Rebecca Hernandez), 171-213 (Karlene Austin). Investigator Austin specifically vouched for the accuracy of the dates and loss amount alleged in the Indictment:

> Q: And between September 1st, 2012 and May 31st, 2013, how much did Ms. Cobat receive in TANF benefits that she was not entitled to?
>
> A: $2,845.

Tr. at 189.

In contrast, Ms. Cobat testified as to her belief that after April of 2012, she did not receive any TANF benefits. Tr. at 328. According to Ms. Cobat, she was actually in a program linked to her own disability claim, and any funds she received would later be deducted from her disability award. *Id.* ("It was a program to give you – that they paid to you that you would reimburse if you

get your disability services, which I was fighting for at the time."). The undisclosed deposit records and supporting material (Exhibits A-C), coupled with available discovery, strongly support Ms. Cobat's understanding of what benefits she received.

The undisclosed deposit records include specific DHS coding for each deposit. Prior to August of 2011, non-food stamp deposits from DHS were identified using the code "ADCBASCM." According to the DHS web site, that code appears to refer to the TANF program: "ADC-BAS: Aid to Dependent Children – Basic."[2] The "ADC" code itself is described as "Aid to Dependent Children, now TANF."

On July 25, 2011, a DHS representative referred Ms. Cobat to the state's "Pre-SSI/SSDI" program: "State Family Pre SSI/SSDI." Ex. B. In the DHS acronym coding, "State Family Pre SSI/SSDI" is listed as code "SFPSS." In the DHS TRACS narrative, the program is refered to as "SFP." Disc at 1520.[3]

On August 11, 2011, Ms. Cobat, with the assistance of a DHS representative, filled out a "Pre-SSI/SSDI" "Interim Assistance Authorization." Ex. C. This form authorizes the state—defined as DHS—to be reimbursed for any funds given to Ms. Cobat pursuant to the "Pre-SSI/SSDI" program:

> If I am found eligible, SSA will send my first retroactive payment to the state. The state will deduct from my first retroactive payment an amount equal to the amount I received from the state for the period starting with the first month I am eligible for a SSI payment and ending the month my SSI payment begins.

---

[2] These, and other DHS acronyms, are available at: http://www.dhs.state.or.us/tools/acronyms_01.html.

[3] The citations to "disc" refer to the DHS TRACS narrative, which the government produced in discovery.

Page 6   MOTION FOR A NEW TRIAL

Ex. C at 1.  In other words, the "Pre-SSI/SSDI" program appears to operate as an advanced loan against Ms. Cobat's eventual SSI or SSDI award.  Any money she received would automatically be deducted from her benefit award.

On August 16, 2011, Ms. Cobat was "found to be eligible for the pre-ssi program effective 9/1/11."  Disc at 1521.  That income would be counted against her SNAP benefits, which would accordingly be reduced.  *Id.*  The DHS worker who documented this change in benefits was listed as "HW10216."[4]  Consistent with Ms. Cobat being in the "Pre-SSI/SSDI" program (with the SFP acronym), the undisclosed deposit records show that the next non-SNAP deposit was coded as "TANFSFP2" rather than "ADCBASCM."  *See* Ex. A at 11 (November 26, 2011 deposit of $339).

Shortly after Ms. Cobat received the first "Pre-SSI/SSDI" program deposit, DHS worker Rebecca Hernandez appeared to review Ms. Cobat's case and sent her three different and conflicting letters related to TANF.  Tr. at 155-58.  None of the letters (or the accompanying TRACS narratives) referenced that Ms. Cobat was in the "Pre-SSI/SSDI" program.  Instead, Ms. Hernandez appeared to believe that Ms. Cobat was receiving TANF benefits, as she recalculated the amount due and established that Ms. Cobat should receive $145 in TANF benefits.  The deposit records then show three deposits of $145 dated December 28, 2011, February 25, 2012, and March 28, 2012.  Ex. A at 11-14.  All three deposits were coded as "ADCBASCM."  *Id.*

On April 4, 2012, Ms. Cobat's personal disability claim was denied.  On April 16, 2012, she spoke with a DHS representative, "HW11649," who was not Ms. Hernandez.  Ms. Cobat expressed confusion about the benefits she was receiving:  "[Ms. Cobat] said she did not know she was still in SFP, she had been told the money/financing went away so she was 'regular' Tanf."

---

[4] DHS case worker Rebecca Hernandez identified these codes as specific to an employee.  Tr. at 148.  Ms. Hernandez's code was "HW04792."  *Id.*

Disc at 1539. Worker HW11649 then told Ms. Cobat "no you are still in SFP" but that Ms. Cobat would need to provide proof that she was appealing her denied claim to continue with the SFP program. After that interaction, the deposit records show one additional payment of $145 on April 26, 2012, coded as "ADCBASCM." Ex. A at 14.

On May 22, 2012, Ms. Hernandez spoke with Ms. Cobat over the phone. Disc at 1541. Ms. Hernandez determined that a new TANF amount of $133 should be issued monthly. *Id.* The deposit records confirm the next four deposits were all for $133 and all coded as "ADCBASCM." Ex. A at 16-18 (deposits on May 26, June 27, July 27, and August 29, 2012).

On September 10, 2012—the starting month for the theft of TANF benefits per the Indictment—Ms. Cobat again spoke with worker HW11649. Disc at 1546. The DHS worker asked about "proof of appeal" for the "pre-ssi" case, and Ms. Cobat responded that she believed she had turned that in but would bring another copy. *Id.*

Following that conversation, only one additional deposit is coded as "ADCBASCM": a $133 deposit on September 26, 2012. That is the only deposit with that coding for the entire TANF timeframe alleged in the Indictment. From September 26, 2012 through the closing of the "TANF" case in May of 2013, every deposit was coded with the "Pre-SSI/SSDI" acronym: TANFSFP2. Thus, during the relevant timeperiod, of the $2,845 in benefits Ms. Cobat received, $2,579 appear to be linked to the "Pre-SSI/SSDI" program.[5]

This undisclosed evidence was relevant and helpful to the defense as it supported Ms. Cobat's testimony and cast serious doubt on the testimony of multiple government witnesses, including a key investigator. Indeed, as discussed below, the failure to produce the deposit records

---

[5] To reach the alleged $2,845 number, the government appears to have included both the $133 deposits from August 29th and September 26th.

were a violation of due process because there is a "reasonable probability of a different result" had the defense had access to those records. *See Jernigan*, 492 F.3d at 1053.

### C. A New Trial Is Warranted Because The Withheld Evidence Was Material To The Defense.

Had the government produced the deposit records and accompanying "Pre-SSI/SSDI" documents, there is a reasonable probability that the outcome of the trial would have been different. As an initial matter, the undisclosed material is fatal to the conviction on Count 3. Count 3 required the government to prove beyond reasonable doubt that Ms. Cobat knowingly stole TANF benefits; the undisclosed material strongly supports her claim that she did not even think she was receiving TANF benefits during the relevant time. In fact, the evidence now shows that her belief may have been factually correct—that is, she may not have been receiving any TANF benefits. Even if she did receive some TANF payments, such as the two $133 deposits in August and September of 2012, that amount is nowhere close to the $1000 loss the government needed to prove to sustain a conviction on Count 3. It is also not clear that the money Ms. Cobat received was derived from federal government funding, as required by 18 U.S.C. § 641. While there was testimony that traditional TANF is partly funded by the federal government (Tr. at 172), there was no evidence that the same was true for the "Pre-SSI/SSDI" program. The "Interim Assistance Authorization" (Ex. C) suggests the opposite by repeatedly referencing that Ms. Cobat would need to repay the state for any benefits received, while also noting that "[t]he state cannot be reimbursed for assistance it gave to me if that assistance was financed wholly or in partly from federal dollars." Finally, there is no evidence that Ms. Cobat's alleged misstatements relating to where Bryce was living had any effect on her "Pre-SSI/SSDI" benefits and, equally importantly, that she was aware that where Bryce lived affected her "Pre-SSI/SSDI" eligibility.

Page 9   MOTION FOR A NEW TRIAL

While Count 3 is directly implicated, the materiality of the undisclosed evidence carries over into the other charged counts as well. Most obviously, the theft of TANF was alleged to be part of the overall scheme charged in Count 1. Tr. at 24 (government opening statement clarifying the fraud charge "encompasses all benefits received"). But in addition to that, many of the defense themes that were directed at all the counts would have been materially bolstered by the undisclosed evidence.

For example, the issue of Ms. Cobat's "intent" was a critical element for all charged counts. The defense acknowledged there were errors in some of the documents but argued that they did not amount to criminal intent. Instead, the defense argued that the mistakes were due to miscommunication between Ms. Cobat and agency representatives, confusion on Ms. Cobat's part as to whether "sole custody" meant a child remained in her "household," and a rush to judgment on the part of investigators. The undisclosed evidence supported those arguments.

The undisclosed documents and the TRACS narratives show that Ms. Cobat received different information from different agency representatives, and was confused as to what benefit program she was in. They also show that the agencies were less than diligent in understanding what other representatives were doing on a case or what they were telling a particular beneficiary. These interactions with agency staff were critical to evaluating Ms. Cobat's intent, because the advice or questions she received would directly affect her understanding of what information she needed to provide. As defense counsel noted, the agency forms often did not address the specifics of Ms. Cobat's situation, such as asking directly about custody or parenting time. *See, e.g.,* tr. at 198-99. One witness testified that the SSA would ask "very specific questions" and would closely examine whether a representative payee had "been convicted of any felonies." Tr. at 40, 43. Yet that same witness seemed to ignore that Ms. Cobat incorrectly answered "Yes" on the SSA form

Page 10 MOTION FOR A NEW TRIAL

that asked whether she had been convicted of a felony in the past year. *See* Govt Ex. 11; Tr. at 59. Moreover, the way a representative may phrase a question to Ms. Cobat during an interview or the context of the question are highly relevant to understanding Ms. Cobat's response. For example, SSA employee Jeffery Holmes acknowledged that in the course of the same interview, Ms. Cobat initially said her marriage status had not changed, and then later stated that she had married Mr. Fox. Tr. at 109. Depending on Mr. Holmes' phrasing or the context, Ms. Cobat may have understood the initial question of marital status to refer to her relationship with Bryce's father, and not a broader question of whether she had remarried. When that was later clarified, she provided the correct information. The point is that Ms. Cobat's responses did not occur in a vacuum, and the undisclosed evidence would cast further doubt on the claimed diligence and accuracy of the agency representatives that formed the backbone of the government's claim that Ms. Cobat's alleged misstatements resulted from criminal intent.

The withheld documents also strongly support the defense argument that investigators had rushed to judgment in prosecuting Ms. Cobat. The credibility of the investigators and agency representatives was critical to the government's case as they provided the testimony as to the alleged loss amounts, the benefits Ms. Cobat received, and the context and content of conversations with Ms. Cobat that resulted in the alleged misstatements. Indeed, the government cited investigator Austin's testimony as the primary reason for the Court to deny the mid-trial motion for judgment of acquittal. Tr. at 278. The jury questioned the lack of specific evidence of benefits received, but ultimately convicted anyway. Tr. at 429-32. Had the defense had the undisclosed documents, it could have severely tarnished the credibility of Ms. Austin and the agency representatives, which is the evidence the jury relied on to convict. Given the importance of that

witness testimony, there is a reasonable probability of a different outcome had they been impeached. *See Benn v. Lambert*, 283 F.3d 1040, 1054 (9th Cir. 2002).

The undisclosed documents were material both as exculpatory evidence and as impeachment of critical government witnesses. As the Supreme Court has emphatically stated in the context of *Brady* violations, the government has a special responsibility to see that a criminal trial is fundamentally fair:

> These cases . . . illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."

*Strickler*, 527 U.S. at 281 (1999) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). That obligation was not fulfilled in this case, and a new trial is therefore warranted.

## II. In The Alternative, The Court Should Grant A New Trial Based On Ms. Cobat Having Received Constitutionally Ineffective Assistance Of Counsel At Trial.

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. That right to counsel is the "right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness and that, as a result, the defendant was prejudiced. *Id.* at 690, 694. Prejudice exists where there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Id.* at 694.

In the ordinary course, claims of ineffective assistance of counsel are best "raised in habeas corpus proceedings, which permit counsel to develop a record as to what counsel did, why it was done, and what, if any prejudice resulted." *United States v. McKenna*, 327 F.3d 830, 845 (9th Cir. 2003) (quoting *United States v. Ross*, 206 F.3d 896, 900 (9th Cir. 2000)). However, where the record is "sufficiently developed to permit review and determination of the issue" or where "the legal representation is so inadequate that it obviously denies a defendant his Sixth Amendment right to counsel," ineffective assistance of counsel claims do not need to wait for collateral review. *Id.* Here, the record is sufficiently develop to demonstrate that Ms. Cobat received constitutionally ineffective assistance of counsel, and there is no need to wait for habeas proceedings before ordering a new trial in this matter.

Defense counsel made numerous errors that warrant a new trial. First, right before trial, counsel demonstrated a fundamental misunderstanding of the law and the allegations in the case. At the pretrial hearing less than two weeks before trial, counsel appeared to have prepared a defense that was legally invalid:

> THE COURT: So [Ms. Cobat] can have legal custody but [Bryce] can move away somewhere else and she shouldn't be receiving benefits, right? If he formally moved away, he wasn't living there any more, even if she had Linn County documents showing custody, she'd have to relinquish benefits, wouldn't she?
>
> [COUNSEL]: No, she wouldn't.
>
> THE COURT: If he moved away?
>
> [COUNSEL]: That's correct.
>
> THE COURT: All right. I disagree

CR 80 at 16.

Page 13 MOTION FOR A NEW TRIAL

Then, on the day before trial, defense counsel again demonstrated a complete lack of understanding of the charges when he claimed that evidence related to Ms. Cobat's own disability claim should be excluded because it was not part of the case. CR 81 at 9-11. The government noted that the Indictment specifically charged Ms. Cobat "with making false statements that led to an award of her own SSI." CR 81 at 11. The Court then had the following exchange with defense counsel:

> THE COURT: So your question is whether there really is in this case a piece of the case that has to do with [Ms. Cobat's] own false statements regarding her own eligibility?
>
> [COUNSEL]: Yes, Your Honor.
>
> THE COURT: And it is in the case, and that is why I made the ruling I did about the interview.

CR 81 at 12. These exchanges show that counsel was legally and factually unprepared to represent Ms. Cobat in a constitutionally adequate manner.

A second error was that defense counsel failed to use available evidence in the record to support the defense theory of the case. For example, to support the argument that Ms. Cobat was confused about agency requirements and was receiving conflicting information, defense counsel failed to use available evidence in the TRACS narratives: on November 24, 2009, a DHS representative wrote: "We discussed [Ms. Cobat's] concerns, the conflicting information of what is being told from different workers re: program benefits and info needed." Disc at 1454. There are numerous similar statements in the available discovery. There were also examples of Ms. Cobat filling out forms incorrectly to her detriment—such as incorrectly stating she had been convicted of a felony on a SSA Representative Payee Report. Govt Ex. 11. Defense counsel failed to use this evidence to show that Ms. Cobat lacked criminal intent, had made numerous careless

reporting errors, and that the SSA apparently did not ask follow-up questions or otherwise notice the blatant error that could have disqualified Ms. Cobat from receiving benefits.

A third error was that defense counsel failed to make necessary objections during the trial. For example, counsel failed to object when the government asked Ms. Cobat to comment on the veracity of Bryce's testimony. *See United States v. Alcantara-Castillo*, 788 F.3d 1186, 1191 (9th Cir. 2015) ("black letter law" that a prosecutor may not ask one witness to comment on the credibility of another witness). The government twice asked Ms. Cobat to comment on her son's testimony. Tr. at 353. Defense counsel did not object and thus, no curing instruction was given.

The government also went far beyond what the Court permitted it to do with respect to evidence related to Mr. Fox, all without defense objection. Prior to trial, the Court limited the use of such evidence based on the government's representation of how it would be used:

> THE COURT: So the only use you want to make of the conviction and the supervision conditions is to say this rebuts her argument that Bryce only wasn't in her home because her ex-husband took him, it tends to show that this was a more permanent arrangement; that is, Bryce not being there was a more permanent arrangement than she's claiming?
>
> [PROSECUTOR]: Yes.

CR 80 at 15. Later in that hearing, the Court again specified the appropriate use of the potentially unfairly prejudicial material:

> THE COURT: And as I've expressed, under the government's theory for this use, it doesn't – it doesn't paint the defendant as someone who brought her son to live in a home with a registered sex offender. In fact, the government's intended use is to show quite the opposite.

CR 80 at 17.

However, the reality of the trial was the government did ultimately use the evidence to simply paint Ms. Cobat as a bad mother. In closing, the government argued:

Page 15 MOTION FOR A NEW TRIAL

>   And you heard that during this time, Ms. Cobat is talking with [Fox's probation officer] about getting a safety plan for Bryce so that he could have contact with Tim Fox, and that Robert Ramsey wouldn't sign off on it. Now according to the defendant, that makes Robert Ramsey a bad man. I think, though, that there are many people who would think that for a father to not want his impressionable teenage son to be around a convicted sex offender, that that's probably good parenting. Good parents say no to things that aren't good for their children.
>
>   . . . And did Ms. Cobat then find an alternative place to live without Mr. Fox so that Bryce could be with her again? No. *It wasn't enough that she was just living with Mr. Fox. She put a ring on it and married him.*

Tr. at 422. A "prosecutor's job isn't just to win, but to win fairly, staying well within the rules." *Alcantara-Castillo*, 788 F.3d at 1191 (quoting *United States v. Maloney*, 755 F.3d 1044, 1046 (9th Cir. 2014) (en banc)). Defense counsel simply allowed the government to paint Ms. Cobat as a terrible parent who "put a ring on it" to marry a sex offender without objecting, despite that the evidence was used in a way that was not permissible under the Court's pretrial ruling.

There are numerous other potential grounds for an ineffective assistance of counsel claim, including that defense counsel did not evaluate Ms. Cobat's cognitive functioning or present similar evidence at trial. Those claims would need further development through an evidentiary hearing. However, the evidence before the Court now is sufficient to find that Ms. Cobat received constitutionally deficient representation, and that a new trial should be ordered.

**III.    Should The Court Find The Current Record Insufficient To Grant A New Trial, An Evidentiary Hearing Should Be Held To Complete The Record.**

In the event the Court determines the current record is insufficient to grant a new trial, the defense respectfully requests that the Court order an evidentiary hearing. Such a hearing should permit additional discovery and ultimately, development of the record for both the Fifth and Sixth Amendment claims in this case. *See United States v. Mazzarella*, 784 F.3d 532, 541 (9th Cir. 2015).

**Page 16 MOTION FOR A NEW TRIAL**

## CONCLUSION

Ms. Cobat's trial was fundamentally unfair as the government failed to produce favorable evidence and her attorney failed to provide constitutionally adequate representation. She respectfully requests this Court vacate her convictions and order a new trial in this matter.

RESPECTFULLY submitted this 27th day of December, 2017.

/s/ Mark Ahlemeyer
Mark Ahlemeyer
Assistant Federal Public Defender