```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF OREGON

 3   UNITED STATES OF AMERICA,      )
                                    )
 4            Plaintiff,            )  No. 3:16-cr-00187-MO
                                    )
 5       v.                         )
                                    )
 6   JAMIE FAYE COBAT,              )  April 6, 2018
                                    )
 7            Defendant.            )  Portland, Oregon
     _____)
 8

 9

10

11

12

13

14

15                    Oral Argument

16              TRANSCRIPT OF PROCEEDINGS

17        BEFORE THE HONORABLE MICHAEL MOSMAN

18    UNITED STATES DISTRICT COURT CHIEF JUDGE

19

20

21

22

23

24

25
```

```
 1
 2                            APPEARANCES
 3
 4   FOR THE PLAINTIFF:      Ms. Helen L. Cooper
                             Ms. Amy E. Potter
 5                           Mr. Gavin W. Bruce
                             United States Attorney's Office
 6                           405 East 8th Avenue, Suite 2400
                             Eugene, OR 97401
 7
 8
 9   FOR THE DEFENDANT:      Mr. Mark P. Ahlemeyer
                             Office of the Federal Public Defender
10                           101 S.W. Main Street, Suite 1700
                             Portland, OR 97204
11
12
13
14   COURT REPORTER:        Bonita J. Shumway, CSR, RMR, CRR
                             United States District Courthouse
15                           1000 S.W. Third Ave., Room 301
                             Portland, OR  97204
16                           (503) 326-8188
17
18
19
20
21
22
23
24
25
```

```
1                    (P R O C E E D I N G S)

2                        (April 6, 2018)

3          MS. POTTER:  Good afternoon, Your Honor.  We're here

4    in the matter of the United States versus Jamie Cobat,

5    16-cr-0187.  Amy Potter, Helen Cooper, and Gavin Bruce on

6    behalf of the United States.  Ms. Cobat is present and

7    represented by Mark Ahlemeyer, and we're here ready to proceed

8    on his motions.

9          THE COURT:  Good afternoon.

10         MR. AHLEMEYER:  Good afternoon, Your Honor.  Would

11   you like me to proceed on my arguments?  Or if the Court wants

12   to direct me in a certain topic, I'm happy to address any of

13   the Court's concerns.

14         THE COURT:  Let me raise a concern that might shape

15   the direction of argument a little, and then depending on the

16   answer to that question, I think I'll know which of two paths

17   to take, in terms of oral argument.

18             So we're here both on a motion for new trial and a

19   motion to dismiss, and that motion for new trial is grounded

20   principally in *Brady* violations, alleged *Brady* violations, with

21   the possibility that it also raises the sort of false testimony

22   prong of both dismissal and new trial.

23             I'm going to start by talking about new trial.  And

24   so there's been the *Mooney-Napue* line of cases about how to

25   think about false testimony, but before we get that far, I sort
```

1  of have to figure out what went wrong here and what didn't, and

2  then we can proceed to analyze how *Brady* and other doctrines

3  apply.

4        So it seems to me that -- well, the *Brady* pleading

5  sets out three things that should have been produced that

6  weren't:  deposit records showing which benefits Ms. Cobat

7  received -- showing which of the benefits Ms. Cobat received

8  were TANF benefits; the DHS TRACS narratives from January 17,

9  showing Ms. Cobat requested certain records from DHS; and then

10  evidence that the TANF benefits were not federally funded.

11        Those are the three main categories of documents you,

12  Mr. Ahlemeyer, say were not produced that should have been; is

13  that right?

14        MR. AHLEMEYER:  Yes, that's correct, Your Honor.

15        THE COURT:  Am I missing anything?

16        MR. AHLEMEYER:  Well, I suppose what I don't know,

17  you know -- I produced Exhibit C as the one document I had

18  showing -- suggesting that it was state funds at issue.  So I

19  imagine there are significant other evidence out there

20  establishing direct funding lines.  I just don't have that

21  evidence.  I don't know what it necessarily looks like at DHS.

22        THE COURT:  So my fourth category is a question, not

23  a category for -- I guess for the United States first.  I'm in

24  a similar position.  As I look at this briefing, including the

25  post-trial production of information, I'm no longer clear in my

1    mind how the government knows if any of this TANF money was

2    federally funded; in other words, if any of it was, for our

3    trial's purposes, the TANF money that was charged in Count 3,

4    as opposed to less than a thousand.

5          MS. POTTER:  Your Honor, there are two different

6    types of benefits that she received.  There are the benefits

7    that are what we would call standard TANF benefits, and those

8    are the ones with the account that begins with the letter A.

9    And we have confirmed -- and it's in the declaration of

10   Ms. Cooper -- that those are federally funded.  It's a very

11   specific category of TANF, which is called pre-SSI TANF, which

12   is essentially a loan on SSI someone is going to receive.  The

13   State of Oregon funds that.

14         So there is a crossover period.  It's less than a

15   thousand dollars because we agree that the pre-SSI TANF were

16   not federally funded.  And that's why we've moved to vacate

17   Count 3.

18         THE COURT:  Mr. Ahlemeyer, let me turn to you.  Are

19   you here today taking the position, in light of all of the

20   current documentation, that there now, as opposed to trial,

21   there now is a reasonable doubt as to whether any of the money

22   was the sort of TANF money that would -- that was charged in

23   Count 3?  We'll call it federally funded.

24         MR. AHLEMEYER:  By my count, based on the coding, I

25   believe there is at least two deposits of $133 within the time

1    frame of the indictment that was traditional TANF.

2            THE COURT:  Which you contend is proof beyond a

3    reasonable doubt of that?  I don't mean "contend."  Do you

4    admit?

5            MR. AHLEMEYER:  That she received those two deposits

6    under that coding.  That's as far as I can say, Your Honor, is

7    that they're coded the way I read TANF benefits.

8            THE COURT:  I'm really just trying to understand your

9    argument, what you are and are not arguing.

10           Are you arguing that in light of everything we now

11   know, as you've described it, some confusion in the

12   documentation, there's any reasonable doubt as to the validity

13   of Count 3, not just on it being less than a thousand dollars,

14   but on her being guilty of it at all?

15           It sort of plays out like this in the analysis, that

16   if there's less than a thousand dollars of TANF funding, then

17   the statements that she got TANF money and that she's lying

18   when she said she didn't, you know, and that sort of thing, end

19   up not being false.  They don't establish a jurisdictional

20   amount if they're -- if Ms. Austin's testimony, for example,

21   doesn't end up being false.

22           If you're contending that there's a reasonable doubt

23   that it satisfied the count at all, then there's a concern

24   about whether false testimony was given.  And I don't know

25   which is your position.

1      MR. AHLEMEYER:  Your Honor, I guess I would say I

2  believe there is reasonable doubt on the count itself because I

3  think the *Brady* evidence breaks down both in sort of intent,

4  what Ms. Cobat understood to be happening, that's one category,

5  and then the other category being whether it was actually

6  federally funded.

7      In terms of whether it's federally funded, I'm in the

8  same position that really Ms. Cobat was pretrial, which is I

9  have the government telling me that these two deposits are

10 federally funded.  I have no independent evidence of that, and

11 that's really the best I can say on that.

12     THE COURT:  Telling you in what way?

13     MR. AHLEMEYER:  Through the testimony of Ms. Austin

14 and in discovery, basically statements by those investigators

15 that yes, TANF is federally funded, as well as the government's

16 continued arguments of that.  Just as I have no independent

17 source of proving that the pre-SSI is not federally funded, I'm

18 relying a little bit on the government on this.  I don't have

19 independent proof either way about whether federal funds

20 directly fund TANF.

21     But if I may, Your Honor, I don't fully agree with

22 the response and analysis of Investigator Austin's testimony,

23 in the sense that she said both, that TANF is primarily

24 federally funded and that Ms. Cobat received $2,845, or

25 whatever the amount is.  So I think those two statements are

1   very connected, and even if she's off on the amount, I think

2   that still is false testimony.

3            THE COURT:  So Count 3 charges receipt of TANF money.

4   Now, I'm curious whether if the money was federally funded but

5   pre SSI, you view your client as raising issues about Count 3's

6   validity, separate from the jurisdictional problem.

7            MR. AHLEMEYER:  Yes, Your Honor.

8            THE COURT:  But you don't know?

9            MR. AHLEMEYER:  Well, I certainly raised that in our

10  initial motion for a new trial.  That was really the ultimate

11  focus of that, was that she believed -- and her intent is

12  obviously critical in any theft case.  She believed she was

13  receiving pre-SSI linked to her own disability.  So we raised

14  the *Brady* point at that point, based on that evidence.  We

15  raised the possibility -- and I certainly want to address the

16  government's response to that, but we raised the possibility in

17  December that these funds were not federally derived or

18  federally owned.  We had both claims at that point, but I did

19  not raise the *Napue* argument at that point because without that

20  jurisdictional problem, I agreed at that point that

21  Ms. Austin's testimony did not fall under that doctrine.  But

22  with what I know now, I believe it did, and that's why I raised

23  it in the supplemental briefing.

24           THE COURT:  You did because you believe her testimony

25  claimed 2,000-plus dollars of federally funded TANF funds?

1    MR. AHLEMEYER:  Exactly, Your Honor.

2    THE COURT:  All right.  Thank you.

3    So I think this issue might fall out, but I'm still

4 not sure.  I'm not asking about the division between federal

5 and state.  I mean, if you had to outline for a jury right now

6 why -- if there were no jurisdictional element to Count 3, and

7 you just had to say, well, some of this money was not pre-SSI

8 and not SNAP and not something else, but federally funded TANF

9 money, what would your proof be?

10    MS. POTTER:  Well, Your Honor, one thing I want to

11 clarify is that pre-SSI is a TANF benefit.  It's a benefit

12 provided under the TANF program.  So we, as an initial matter,

13 would argue that all of those benefits were a type of TANF.

14    In terms --

15    THE COURT:  I guess I'm aware of that, but concerned

16 about what Count 3 charged.  In your view, what did Count 3

17 charge?

18    MS. POTTER:  Count 3, as indicted, charged theft of

19 government property.  So we charged the receipt of federally

20 funded -- the theft of federally funded benefits.  So --

21    THE COURT:  Through a -- I mean, you have three

22 counts of theft of government property.

23    MS. POTTER:  The TANF program.

24    THE COURT:  And Count 2, remind me, is?

25    MS. POTTER:  Count 2 is -- Count 1 is the wire fraud,

1    Count 2 is the SSI, and Count 4 is the TANF.  So Count 4, yeah.

2         THE COURT:  So, in your view, even if the money

3    somehow labeled pre-SSI, it fits within not Count 2 or anything

4    else, but Count 3 of the charged -- the conduct in Count 3?

5         MS. POTTER:  It's in the Count 3, in that it's TANF.

6    We lacked jurisdiction over the funds that were not federally

7    funded.  So it's somewhat like a bank robbery where we failed

8    to establish the bank was insured by the Federal Deposit

9    Insurance Corporation.  You still robbed the bank, but if it's

10   not insured, the federal government lacks jurisdiction.

11        So to the extent that we can no longer prove that

12   more than a thousand dollars of the TANF benefits are federally

13   funded, we have moved to vacate Count 3, but the application

14   and the requirement that she have a child living in her home

15   remained, whether it was traditional TANF or this pre-SSI TANF.

16   So to the extent --

17        THE COURT:  What do you make of Mr. Ahlemeyer's

18   argument that Ms. Austin actually testified at trial to the

19   receipt of plus $2,000 of TANF money?

20        MS. POTTER:  She did testify to that, and that was

21   accurate.  She received two types of TANF.  Now, what

22   Ms. Austin clearly said is that TANF was both federally and

23   state funded.  At a later point in her testimony, she was asked

24   in total how much TANF was received, and it's the $2,000

25   figure.  All of that --

1    THE COURT:  Isn't the import of that testimony to the

2    jury, and, in fact, the use you, the government, made of it to

3    the jury, proof that 2,000-plus dollars of federally funded

4    TANF money were received by her?

5    MS. POTTER:  No.  I don't believe that her testimony

6    was that it was federally funded.

7    THE COURT:  That's not my question.  My question is

8    did you use her testimony to prove Count 3 in an amount in

9    excess of a thousand dollars?  In other words, did you take her

10   statement that she received $2,000 of TANF money in order to

11   persuade the jury that she had received $2,000 of federally

12   funded TANF money?

13   MS. POTTER:  I think what we did was take the

14   testimony that it was mostly funded by federal dollars and some

15   funded by state, and we argued that more than a thousand

16   dollars of this was federal.

17   THE COURT:  Whose testimony was it was mostly funded?

18   MS. POTTER:  It was Ms. Austin that said it was

19   predominantly federal.  If you give me one moment, I think I

20   can find the transcript cite.

21   THE COURT:  Wouldn't that make Ms. Austin's

22   testimony, at least in the way you used it to the jury, false?

23   It's false that she received more than a thousand dollars in

24   federally funded TANF money, and to the degree Ms. Austin was

25   the evidence you relied on to make that argument -- she said

1    $2,000 of TANF money, but if what you told the jury she meant

2    was $2,000 of federally funded money, then its presentation to

3    the jury was false, right?

4         MS. POTTER:  It was not true that $2,000 of it was

5    federally funded.  That is correct, Your Honor.

6         THE COURT:  I'm not --

7         MS. POTTER:  I mean, I --

8         THE COURT:  I know that's not true.  What I'm trying

9    to get at is is it not only not true, but did you use

10   Ms. Austin to prove something that turned out not to be true?

11        MS. POTTER:  I don't think we specifically mentioned

12   Ms. Austin's testimony, to be frank, Your Honor.  I don't think

13   there was much debate or argument at all about the source of

14   the funding for purposes of TANF.  So to the extent --

15        THE COURT:  Did you have any other evidence that she

16   received more than a thousand dollars in TANF money?

17        MS. POTTER:  Other than Ms. Austin's testimony, no --

18   oh, and the document, the TRACS narrative that indicates how

19   much was in there.  So we did have document -- documentary

20   evidence.  That's actually what the jury was referred back to

21   for purposes of their questions.  When the jury asked the

22   question about how much of SNAP and TANF was received, they

23   were referred to the specific pages of the TRACS narrative for

24   purposes of determining it.  So there was that evidence.

25        THE COURT:  All right.  Thank you both.

1    So then in terms of false testimony, false testimony

2    or argument, I guess, is sort of how you briefed it, you want

3    to allege at least two things, right?  You want to allege that

4    Ms. Austin's testimony, as utilized by the United States at

5    trial to support the idea that she got more than a thousand

6    dollars in federally funded TANF money was false.  Right so

7    far?

8        MR. AHLEMEYER:  Yes, Your Honor.

9        THE COURT:  And then on a somewhat related issue, you

10   want to use the TRACS documents to show that the argument that

11   your client just made up yesterday, that she hadn't actually

12   been receiving TANF money or didn't think she had been, that

13   that's belied by documents that would have made that

14   argument -- that now make that argument false, correct?

15       MR. AHLEMEYER:  Absolutely.  And especially that it

16   was -- that argument was specifically contrasted to

17   Investigator Austin's testimony.

18       THE COURT:  What else are you alleging by way of

19   false testimony documents or argument?

20       MR. AHLEMEYER:  In terms of false testimony, I'm

21   relying on Ms. Austin's statements as to the TANF.

22       THE COURT:  Well, then what about the TRACS?

23       MR. AHLEMEYER:  The TRACS narrative that the

24   government just referred to, that one?

25       THE COURT:  Well, no.  I thought you were also making

1    the argument that the closing argument saying that, you know,

2    your client just made this up yesterday, ends up belied by the

3    documentary evidence produced after trial.  Right?

4         MR. AHLEMEYER:  Absolutely.  I think that was a false

5    statement.

6         THE COURT:  Anything else?

7         MR. AHLEMEYER:  In terms of false statements, no.

8         THE COURT:  So I want to make sure I understand the

9    universe of things that you're claiming justify either

10   dismissal or new trial.  It's those two plus what else?

11        MR. AHLEMEYER:  The universe of documents themselves.

12        THE COURT:  Let's start with documents, and then I'm

13   going to go to testimony, and then I'm going to go to argument.

14        MR. AHLEMEYER:  The documents I presented in court

15   are the only ones that I had that showed her testimony about

16   receiving pre-SSI could have been supported by documents.  So

17   yes, that's the ones I'm relying on for that, that she actually

18   received pre-SSI --

19        THE COURT:  Your argument for new trial or dismissal

20   is fundamentally grounded in *Brady*, right?

21        MR. AHLEMEYER:  *Brady*, yes.

22        THE COURT:  So *Brady* is failure to produce.  So

23   specifically what did the government fail to produce by way of

24   documents?

25        MR. AHLEMEYER:  All of the attachments that I have

1  put together, and anything that would again -- my documents --

2          THE COURT:  That's the deposit records, the TRACS

3  narrative, and the jurisdictional email chain, right, and

4  related documents?

5          MR. AHLEMEYER:  Exactly, related documents on that.

6          THE COURT:  And then *Brady* can also be false

7  testimony.  And that's Ms. Austin basically?

8          MR. AHLEMEYER:  Correct, Your Honor.

9          THE COURT:  And *Brady* can be grounded in improper

10  argument not founded in true evidence, and that's the argument

11  that your client just made up this TANF argument yesterday?

12          MR. AHLEMEYER:  Yes, Your Honor.

13          THE COURT:  Is that it?

14          MR. AHLEMEYER:  With respect to this claim, yes.  I

15  have more on the dismissal, because I think it goes beyond the

16  evidence, but --

17          THE COURT:  Let's start with the new trial, then.

18          So, all right.  So I've got to look at several things

19  to decide if a motion for new trial grounded in *Brady* is well

20  taken.  And there are several elements the case law suggests I

21  look at.  One is was the omitted or suppressed evidence

22  favorable to the defendant, would it have been favorable.

23          And so setting aside for one moment the potential

24  dismissal of Count 3, just asking at trial would that evidence

25  have been favorable to the defendant, the answer as to all

three of the categories of evidence, documentary evidence I
just listed, the answer is yes, it would have been favorable.

Now, this doesn't exactly describe what to do about
unfavorable but false argument or testimony, but I think I have
to try to flip that around and just say was it false testimony,
and then was it false testimony that was unfavorable to the
defendant.  I think the answer to that is yes in each instance.

The second question is was it suppressed.  And here
we come to the *Raley* case.  I think the money quote is, "Where
defendant is aware of the essential facts enabling him to take
advantage of any exculpatory evidence, the government does not
commit a *Brady* violation by not bringing the evidence to the
attention of the defense."

So your client actually reached out for some of these
documents prior to trial.  Why doesn't *Raley* mean there's no
suppression by the United States and therefore no *Brady*
violation?

MR. AHLEMEYER:  Your Honor, I think *Raley* has been
cabined in some cases since then, including the *Tennison* case,
570 F.3d 1078.  It clearly doesn't stand for the proposition
that anything the defendant could be aware of, as said in
*Tennison*, no longer means the government can have suppressed
it.  And I think that's the key issue.

But more importantly, I think it's very
distinguishable in this case, because in *Raley*, we're talking

1    about third parties' documents, something that the defendant
2    clearly knew he had been in this pretrial custody, that he had
3    seen medical help, that there would be documentation of that.
4    It wasn't something that was necessarily even in the
5    government's possession.
6            Here we're dealing with a totally different scenario,
7    where the agency that contests these documents was one of the
8    prosecuting agencies.  It was the case agent.  So I think it's
9    a very different analysis in *Raley*, and *Raley* is easily
10   distinguishable.
11           I would add on the factual part of that, we do have
12   additional evidence that Ms. Cobat actually asked for those
13   records significantly earlier than that January date.  In the
14   same exhibit that I attached, Exhibit A to the motion to
15   dismiss, the prior two narratives show that she actually asked
16   for these documents, her entire DHS file, in October -- on
17   October 17th, 2016.
18           I also have DHS's -- and I'm happy to provide this as
19   an exhibit, her request dated October 17, 2016.  And I don't
20   know in the DHS part, I don't know what happened, but both the
21   "denied" and "delayed" boxes are checked.  So I think what my
22   client did is made every possible effort to get these records,
23   filled out a form, was either denied or delayed, for reasons
24   that I would love to have testimony on.  She didn't get those
25   records.

1    So the January -- that was actually a follow-up, when

2    she went in there and wasn't quite clear on what the deposit

3    records meant.  She got them, said, well, you know, this is

4    enough for my attorney to do something with.  Obviously the

5    records she got were not sufficient and were not the ones we're

6    talking about today.

7    THE COURT:  So your two arguments for distinguishing

8    *Raley* are that *Raley* involved true third-party custody of the

9    relevant documents, and here your client made efforts to get

10   the documents and was -- was in some sense denied?

11   MR. AHLEMEYER:  Correct, Your Honor.

12   THE COURT:  All right.  And your authority for, as

13   you say, cabining *Raley* is what again?

14   MR. AHLEMEYER:  It's discussed in *Tennison v. City*

15   *and County of San Francisco*, 570 F.3d 1078.

16   THE COURT:  And in your view, in what way does

17   *Tennison* limit *Raley*?  What's the holding?

18   MR. AHLEMEYER:  Well, in this case, they

19   determined -- it was again a type of suppression, information

20   in police files.  This is actually not a criminal case, this is

21   the 1983 after it, but they're analyzing whether it was *Brady*

22   material.

23   And essentially the defendant was aware that a

24   certain witness had perhaps made favorable statements.  That

25   was the argument of police inspectors who had not produced

1    certain notes.  So because the Court analyzed, well, because

2    the defendant knew that this witness might have had some

3    helpful information, they could have gone and talked to that

4    witness, asked that witness, they didn't do that, and the Court

5    said -- and the inspector cited *Raley* for that proposition, and

6    the Court said no, that's not good enough.  They happened to

7    know that this witness might have good information, it was in

8    the police files, and needed to be turned over.  So to me,

9    that's a closer one when we're talking about the agency or the

10   investigators.

11           But I do, Your Honor -- that is a focal point of this

12   Court.  *Raley* is a very interesting case, and there's been

13   arguments back and forth about this.  I'm not sure it's

14   entirely clear how the Ninth Circuit is currently measuring

15   this idea of what the defendant is on notice about and what

16   they need to get.

17           In the government's initial response to the motion

18   for a new trial, they cited -- I believe it was the *Aichele*

19   case, which that -- it sort of built on all of these, including

20   *Raley*, built on that holding initially.  That was held to be

21   dicta by *Benn v. Lambert* in 2002.  That's 283 F.3d 1040.

22           THE COURT:  Its foundation was dicta four years

23   before *Raley* says it was not dicta?

24           MR. AHLEMEYER:  No, I'm sorry.  The foundation that

25   this line of cases was built on.  So *Raley* did come back and

1    use that initial holding.  The Ninth Circuit said this is still
2    an open question.
3              THE COURT:  When did the Ninth Circuit say that and
4    where?
5              MR. AHLEMEYER:  It said that in the -- in *Benn v.*
6    *Lambert*.
7              THE COURT:  Four years before *Raley*?
8              MR. AHLEMEYER:  Right.  So then *Raley* came out, and I
9    think as *Tennison* shows, and later cases that I don't quite
10   have at my fingerprints right here, that this is a debate about
11   really what are the contours.  It's certainly not as broad as
12   the government suggests, that any public record --
13             THE COURT:  I guess I'm not sure why you don't have
14   them at your fingerprints, Mr. Ahlemeyer.  This is your weakest
15   link, whether there was suppression or not.  If *Raley* says
16   there wasn't and you've got an argument that *Raley* doesn't mean
17   what it says, I wish I had it right front of me.
18             MR. AHLEMEYER:  Well, I do have *Milke v. Ryan*, 2013,
19   another one that discussed this.  And that specifically said
20   that the Court -- this was an issue of impeachment evidence of
21   an officer who testified at a trial.  And the Court held there
22   that "The court documents showing this officer's misconduct
23   were available in the public record doesn't diminish the
24   state's obligation to produce them under *Brady*."
25             So what I'm getting at is there's a lot of cases on

1  this issue, and that one line from *Raley* I don't think is going

2  to be the controlling approach from the Ninth Circuit.

3         THE COURT:  Thank you.

4         For the United States?

5         MS. POTTER:  Well, Your Honor, I would disagree.  I

6  believe *Raley* does control here, and I think one important

7  point is the defense counsel was aware of the request from

8  October 2016 because that was part of the discovery and the

9  TRACS records that were turned over to defense counsel.

10         THE COURT:  How does that help you?  If you know your

11  client sought the records and was denied, then that means

12  you're supposed to seek them again?

13         MS. POTTER:  Well, the TRACS records do not say they

14  were denied.  This is -- we did not have this document, and I

15  have not seen it.

16         THE COURT:  Do you want to take a look at it?

17         MS. POTTER:  Yes.

18         MR. AHLEMEYER:  (Handing.)

19         I have a copy available for the Court as well, if the

20  Court would like to see that.

21         THE COURT:  Yes.

22         MR. AHLEMEYER:  Should I put a defense exhibit

23  sticker on that?

24         THE COURT:  Yes.

25         MR. AHLEMEYER:  Would the Court prefer a new set of

1  exhibit numbers for this hearing or should I just continue with

2  whatever it was?

3          THE COURT:  Call it Exhibit A.

4          MR. AHLEMEYER:  Okay.

5          MS. POTTER:  Your Honor, I believe it shows that she

6  requested them on October 2016, and then that she was given

7  information in January of 2017, which it originally says

8  "denied," and then it says "delayed," and -- but then it says

9  she visited the office on -- at the bottom, January 18th, 2017,

10 and received a payment printout and told the worker this was

11 enough -- this was enough information requested, which we

12 argued, which is that prior to trial, she did have the

13 information she wanted from DHS, and that's what those January

14 TRACS records reflect.

15         I think the other point is she even had been asking

16 DHS, but there's no request from counsel to the government to

17 receive these records.  And this is a -- you know,

18 unfortunately, a fairly common occurrence, where defense

19 counsel reaches out to some agency for whatever reason and they

20 can't get the records they want.  I frequently receive calls

21 from defense counsel, "Hey, the VA or BOP won't give me this

22 information.  Can you call them and get it for me?"

23         There's nothing that -- we would have happily

24 obtained the records that were requested, but I think what

25 happened, or what it appears to reflect on this form in the

1    January 2017 TRACS record, that she eventually did get what she

2    wanted and there was no need to ask the government for

3    information.

4         The problem for Ms. Cobat and for this argument is

5    that the information didn't show what she wanted it to show,

6    because what it does show is that she was receiving a type of

7    TANF, and her argument was she was never receiving TANF, and

8    she told everyone she wasn't receiving TANF.

9         THE COURT:  We'll get to prejudice in a minute.  I'm

10    now just looking at suppression.

11         So your argument initially is that *Raley* says no

12    suppression, and then the government's -- excuse me, the

13    defense's response to that is, well, maybe *Raley* shouldn't

14    apply if -- well, one, if it's in the possession not of the

15    hospital or doctor's office or something like that but in the

16    possession of one of the investigating prosecuting agencies in

17    the case itself, right?

18         MS. POTTER:  Yes, though --

19         THE COURT:  That is a distinction that's not

20    frivolous, wouldn't you agree?

21         MS. POTTER:  I agree that it's not frivolous.  I

22    would say I do not believe Oregon DHS was a prosecuting agency.

23    It's a separate agency that administers benefits.

24         And he did cite cases, some of those names I

25    remember, but I did not prepare those cases for argument, but I

1    do not believe that any of those cases hold that *Raley* doesn't

2    apply when it's a government agency, for example, in this case,

3    when it's Oregon DHS.  I do not -- I'm not aware of any Ninth

4    Circuit case that would hold in this fact scenario there was

5    suppression solely because we were prosecuting a theft of

6    benefits case and the documents came from one of the agencies

7    that paid out benefits.  So I believe *Raley* does control here.

8              THE COURT:  We know a couple of goalposts, I guess.

9    We know that *Raley* applies sort of undiminished when the

10   records are just in the custody of some third party, say a

11   doctor, and the defendant knows that he's -- he or she has been

12   to the doctor and could ask the doctor for the records.

13             MS. POTTER:  Yes.

14             THE COURT:  There's some question being raised about

15   whether *Raley* continues to apply in the other extreme, which is

16   that yes, there are records, and yes, the defendant knows about

17   them, but they're in the possession of the prosecuting agency.

18   If you're being prosecuted by Multnomah County DA's office and

19   the PPB has the records, maybe it wouldn't apply.  You're being

20   prosecuted by the U.S. Attorney's Office and the FBI has the

21   records, maybe we wouldn't apply *Raley* directly in that

22   setting.  And we're in between here.  So I don't know -- I'll

23   have to take a closer look at this.

24             But in any event, absent some exception, in my view

25   *Raley* applies at least in part.  And I'll take another look at

1   this.  But it means there's no suppression at least as to some

2   of the documentation.

3           As to the documentation that there is not the

4   statutorily required federal funding amount, those documents I

5   don't think Ms. Cobat could have gotten from anybody on her

6   own, right?

7           MS. POTTER:  Well, I believe she could have asked --

8   the defense counsel could have asked the prosecution to verify

9   it, and they would have been forced to go back and double-check

10  that fact.  And defense counsel did not ask for those.

11          THE COURT:  That's not the *Raley* rule, though.

12  That's something entirely different, right?

13          MS. POTTER:  That is a different rule, but I believe

14  it's a rule that should apply to this case.

15          THE COURT:  So you say was it suppressed, and the

16  answer is no if -- I guess your rule is the answer is no if

17  nobody asked for it?

18          MS. POTTER:  No, the answer is no when the government

19  provided nothing -- the government didn't provide some document

20  that said this is federally funded.  The government simply

21  stated that this was federally funded, and there was grand jury

22  testimony that said that TANF is funded federally and through

23  the state, and there was no -- there's no argument or question

24  about that.  Defense counsel never sought out to clarify how

25  much was federally funded and how much was state funded, and

1    that was information that the defense could have sought out.

2          THE COURT:  All right.  Thank you.

3          I think there's at least a strong possibility that

4    there is suppression as to the jurisdictional limit documents,

5    and currently, until I get more on this matter, I think *Raley*

6    applies to the rest.

7          The next prong is prejudice.  And here I'm going to

8    come immediately back to the jurisdictional documents.  And

9    there the only prejudice as to not receiving the jurisdictional

10   documents -- those aren't credibility documents in any way.

11   That issue is not a credibility issue, whether she meets the

12   jurisdictional amount or not as to Count 3.

13         MR. AHLEMEYER:  It has nothing to do with her

14   credibility.

15         THE COURT:  So I don't find prejudice for the

16   potential suppression of the documents that simply show the

17   lack of federal funding.  It's a close distinction because I'm

18   going to come back to Ms. Austin's testimony here in a minute

19   more generally, but just the bare documents about, you know,

20   federal funding themselves, separate from any false testimony

21   that might arise from it, those are two different things in my

22   mind.

23         MR. AHLEMEYER:  May I inquire about that distinction,

24   Your Honor?  Because the way I had thought about it, really

25   we're looking at whether there's a realistic likelihood of a

1    different outcome at trial is how we measure prejudice overall.

2    I understand this jurisdictional material to answer 100 percent

3    yes, there would have been --

4              THE COURT:  Well, sure it does.  It answers 100

5    percent yes as to Count 3.

6              MR. AHLEMEYER:  Yes, talking about that, yes.  There

7    are arguments I have about --

8              THE COURT:  To bleed over, to infect the other

9    counts, this is all sort of under the table for the jury.  So

10   except to the degree that you have an argument that Ms. Austin

11   testifying falsely might generally infect other counts, but

12   just the documentation, I mean, for one, that probably never

13   would have gone to the jury in any meaningful way.  I agree

14   it's 100 percent prejudice as to Count 3, but in my view only

15   as to Count 3.  That's just those documents.

16             MR. AHLEMEYER:  Sure.  Sorry.

17             THE COURT:  Go ahead.

18             MR. AHLEMEYER:  I was just going to say, you know,

19   the government does raise the issue of Investigator Austin was

20   never asked these questions, so I don't know how she would have

21   answered it, but I do think, based on what she said in the

22   grand jury and her direct testimony --

23             (A cell phone rings.)

24             THE COURT:  I'm sorry, just a moment.

25             I don't want anything else to go off in this

1  courtroom.  The next person who has a device go off in this

2  courtroom will be escorted out.  So turn off all your devices

3  now.

4          Mr. Ahlemeyer.

5          MR. AHLEMEYER:  Sorry, Your Honor.

6          So I was just going to say because I think the

7  credibility of both the investigators and all the DHS witnesses

8  was so critical, that showing that there was, you know, lapse

9  in communication, that it wasn't a thorough investigation would

10 bleed over into the other counts.

11         THE COURT:  We'll come to that.

12         Talking about this at trial versus just the

13 nondisclosure of the bare documentation post trial are two

14 different things.

15         So if there's no suppression on some of these, I

16 don't ask the prejudice question, I ask it where there's

17 suppression.  And Mr. Ahlemeyer is right.  I'm looking at

18 whether it undermines confidence in the outcome or

19 alternatively creates a reasonable probability that the result

20 would have been different.

21         I want to think about the nature of the potential

22 prejudice, then, from Ms. Austin's testimony and the closing

23 arguments and that cluster of things, separate from the bare

24 documentation.

25         So here's how I see it, and I invite you to correct

1    me if I've oversimplified what happened at trial, but the

2    defendant's main defense here was a lack of intent or perhaps

3    lack of the knowing element of the counts.  And I'd sum it up

4    colloquially this way.  Her argument essentially was I didn't

5    know or understand that I couldn't get these benefits if I had

6    sole legal custody but not actual physical custody of my son.

7    That's her main argument:  I had some confusion or maybe even

8    just an improper understanding of what was going on.

9            And the government's main response to that was to say

10   that she's lying, that she is, in fact, a liar.  And that

11   worked two ways.  One, that the government's argument goes, she

12   lied repeatedly about whether her son lived with her, whether

13   he or she got the money, and so that supported the government's

14   argument that if you're just confused or mistakenly believe

15   you're entitled to benefits, based on just legal custody alone,

16   then you don't need to tell these lies.  That's the first use

17   of the testimony the government put on that she's lying.

18           And the second is that because she is a liar, so says

19   the government, you don't need to believe her when she now says

20   she's confused.  That seems to me to be the core of what we're

21   talking about when we talk about the impact potential at trial

22   of Ms. Austin's testimony and the potentially improper argument

23   in closing that she's just making up a defense right now that

24   she's never asserted before.

25           I'm sort of in a phase two, Mr. Ahlemeyer.  I've

1    tried to cover the documents themselves.  Does that cover
2    everything but the documents that you're concerned about here
3    that would lead to either a new trial or dismissal?
4           MR. AHLEMEYER:  Certainly not dismissal, Your Honor,
5    because I think another --
6           THE COURT:  That's right.  We'll come back to
7    dismissal.
8           But as to new trial, this sort of radiating inference
9    of the documents that led to these false statements and these
10   false statements on the other counts -- of course Count 3 will
11   be gone.  On the other counts is the core of your new trial
12   argument, right?
13          MR. AHLEMEYER:  I would agree that's the core.
14   Certainly with Count 1, I've incorporated all the benefits, so
15   particularly related there.
16          THE COURT:  Right.  So I think of it this way -- if
17   you'll forgive me.  Let me just finish this out and then I'll
18   hear from you again.
19          Because of the nature of the defense and the nature
20   of the government's response at trial, I think my question
21   today is do the *Brady* violations create a reasonable
22   probability that the result would have been different, or put
23   another way, is the evidence, untainted by *Brady*, if there is
24   any, that she lied strong enough to overcome any reasonable
25   probability that the *Brady* violations contributed meaningfully

1   to the jury's decisions.  Did the jury use the evidence --

2   evidence and arguments they never should have heard to convict,

3   or did they -- or even if you pulled all that out and gotten

4   rid of all the taint, did they have enough to go on to convict

5   on the other counts anyway.

6          And I do want to throw in briefly, I think, when we

7   talk about now not just *Brady* suppression but false testimony

8   evidence, then you've got to talk about the *Mooney-Napue* line

9   of cases, and it's really the same question:  Was the testimony

10  actually false?  Did the prosecution know or should it have

11  known it was false?  And was that false testimony material?

12         So maybe to state it even more generally, what was

13  the impact on the jury of hearing Ms. Austin's testimony and

14  hearing the closing argument that Ms. Cobat just made this up

15  yesterday, both of which were improper?

16         Mr. Ahlemeyer.

17         MR. AHLEMEYER:  I think I couldn't overstate how

18  important it is.  First I would say, just to back up one

19  moment, I think there is a slight difference in the *Napue*

20  versus *Brady* analysis in terms of measuring the ultimate

21  outcome, with *Napue* being slightly lower on the could a jury

22  have reasonably found differently, as opposed to would the jury

23  have.  So just to flag that for the Court.

24         THE COURT:  Thank you.  I think that's correct.

25         Go ahead.

1    MR. AHLEMEYER:  Excuse me.  I think, you know,

2    overall this really did come down to a credibility contest.

3    What they're saying are lies are generally Ms. Cobat writing

4    "lives with her son" in these forms, and these forms are not

5    produced in isolation.  So I think the jury is really assessing

6    numerous witnesses from the agencies who said, you know, we are

7    very professional, we read this script, we hear what the client

8    says, we write it down exactly, this is what she says, TRACS

9    narratives are accurate.

10    And Ms. Cobat's defense, as the attorney at trial

11    brought up, is these forms don't have many of the issues that

12    she had.  They don't ask about parenting time, they don't ask

13    about custody time.  So it really does come down to testimony

14    between her and these witnesses about how these conversations

15    went.

16    And I think the government did take advantage of

17    that, once they were able to say she's not credible based on

18    Ms. Austin's testimony, that she's created this last-minute

19    defense.  The closing goes on to talk about how these social

20    workers are good people trying to help people, and instead

21    she's a fraudster.

22    So I think it's clear there was this credibility

23    difference.  It's happening in conversations that are not

24    recorded, and their witness -- the government was able to

25    present their witnesses as very believable, accurate, and

1    professional, and Ms. Cobat as the opposite by seizing on this
2    issue.
3              THE COURT:  Let me ask it to you this way.  And
4    it's -- I'm going to give you an opportunity when I'm done with
5    this hypothetical to explain to me why it doesn't apply here.
6              But is it possible for the United States to put on a
7    case like this where it's a credibility contest in some ways,
8    and show that the defendant lied in 20 meaningful ways, and
9    then post trial we learn that the government was wrong in
10   asserting two of those lies, that *Brady* or other issues mean it
11   never should have put on that evidence or made that argument?
12             Is it possible to have a case where nevertheless we
13   have no question that the other 18 lies would have been more
14   than enough to -- were more than enough to completely persuade
15   a jury of guilt?
16             MR. AHLEMEYER:  I would absolutely agree, Your Honor,
17   this is not a sufficiency of evidence test.  So yes, those
18   cases could exist.
19             THE COURT:  Meaning you can have such powerful
20   evidence otherwise, non-*Brady* and tainted evidence otherwise,
21   that you don't really have much question that the jury would
22   have convicted anyway, even if you have could fix the *Brady*
23   problem?
24             MR. AHLEMEYER:  I would be very concerned on a
25   straight credibility question of that.  So --

```
 1          THE COURT:  All right.  So in this case, there was
 2   other evidence.  You've pointed to some of it.  But there's, of
 3   course, much other evidence utilized in the closing argument at
 4   trial of her making a variety of false statements, not just
 5   checking forms.
 6          MR. AHLEMEYER:  There were allegations thereof.  The
 7   ones I can think of that the government has and continues to
 8   brief on are -- were not actually rebutted by any specific
 9   evidence.  So the closing was -- you know, one of the
10   categories was, "oh, really," or something to that effect of
11   she's just not believable.  Those are with respect to purchases
12   perhaps made on the EBT card.
13          The government didn't ask Bryce about those, and so
14   there was no rebuttal to her statements that "This is what I
15   spent the money on.  I purchased something for Bryce here."
16          They could have asked him did you ever get anything
17   from this store or that store?  That wasn't done.  So I guess I
18   see more of an argument response in closing than I do an
19   evidentiary one.
20          THE COURT:  All right.  So, in any event, your idea
21   is that in a credibility contest, if one or two of the
22   important points of credibility end up being tainted, and then
23   you just can't know what the jury did with those versus the
24   others?
25          MR. AHLEMEYER:  Absolutely, because I don't know how
```

1  a jury would have weighed those other 18 versus two.  Maybe

2  these two were so important that they colored the view of the

3  others.

4         THE COURT:  All right.  Thank you.

5         MS. POTTER:  Thank you, Your Honor.

6         On the first point, or the legal argument, I do

7  believe that you can assess the rest of the evidence, even if

8  you find that there was one issue.  So, for example, if you're

9  going to find there might have been a false statement about

10  what she said, I think the *Johnson* decision out of the D.C.

11  Circuit and the *Lazarenko* decision from the Ninth Circuit say

12  you look at the evidence as to the rest of the counts, if that

13  evidence was overwhelming.

14         So if the government can put forward -- and I believe

15  we can, and I'll go over it -- overwhelming evidence of her

16  lies and credibility issues, the jury would have concluded

17  regardless of that statement that she was not credible, then I

18  think the Court can deny the motion for new trial and certainly

19  any dismissal motion.

20         And so defense counsel has focused specifically on

21  this notion of legal custody versus where she was living, and

22  that was the key credibility issue.  But there were other lies

23  that I think were very critical and some were on documents that

24  were inconsistent with each other.

25         For example, in Trial Exhibit 11, which is the 2014

1   rep payee report, she reports her son lived with her in Lebanon

2   the entire time.  But then in September of 2016, she had told

3   DHS that she had moved to Redmond.  So there you have two

4   completely different addresses.  And some of that appeared to

5   be strategic, from where benefits were placed.

6        So then she also says, when she's telling DHS for the

7   Exhibit 11 that she was living in the Lebanon area in the

8   Mayfair address, the government offered someone who rented a

9   house during that exact period and said she never lived there.

10        In addition, that renter testified that when she went

11   to go to the house to look at it to rent, there was another

12   renter there.

13        There were also all of her statements about how she

14   never lived with Tim Fox.  And those were overwhelming, because

15   you not only had the testimony of the probation officer, you

16   had the testimony of the renter and you had the testimony of

17   her son, all saying she was living with Tim Fox, with multiple

18   documents where Tim Fox was signing off that he was living with

19   her.  We had her documents regarding what the rules were that

20   said he was going to live with her.  We have the testimony that

21   they shared a room together and we have the repeated testimony

22   that Bryce was never there.

23        So then she takes the stand and she doesn't just say

24   that she was confused about, you know, legal custody versus

25   physical custody.  She testifies that Bryce is there all the

```
 1    time, that he comes, that he has a room.  No one ever testified
 2    that they saw Bryce at the home.  And indeed he could not be
 3    there when Tim Fox was there.
 4                In terms of the monetary spending, in terms of
 5    whether it was just an argument, well, that's the job of the
 6    jury to assess the credibility of the witness.
 7                She testified that she bought cologne at the
 8    Victoria's Secret and soda and ice at the liquor store for her
 9    son.  The jury evaluated that, decided whether she was credible
10    as to that statement, much like they assessed whether she was
11    credible in 2016, when she told the Social Security
12    Administration that she hadn't lived with her husband during
13    that entire period of time.
14                THE COURT:  Based on what do I decide that the jury
15    relied on the Victoria's Secret and liquor store evidence to
16    find her not credible?
17                MS. POTTER:  Well, I don't think they relied on just
18    that.  They had all -- I guess what I'm disputing is --
19                THE COURT:  One of the things you're asking me to do
20    is make a tally of all of the ways in which you have proof that
21    she lied that are in some way sealed off from any taint of the
22    Brady problem.
23                MS. POTTER:  Yes.
24                THE COURT:  And I'm not sure based on -- I'm not sure
25    how I go about doing that.
```

1    MS. POTTER:  I think you look at all the documents

2    and all the false statements on the documents, and I think they

3    can assess her -- what we're focused on is one statement during

4    rebuttal closing about that this was the first time she had

5    raised the argument.  That was not the focus of the

6    government's case nor was it a key piece of evidence for

7    purposes of the government's case.  The government's case

8    was --

9    THE COURT:  Well, the closing argument spends a lot

10   of time on TANF money.  That's for sure, right?

11   MS. POTTER:  Right.

12   THE COURT:  Is the count now gone from the case?

13   MS. POTTER:  Yes.  But I'm sorry, I was focusing on

14   the statement that this was the first time she had raised this

15   defense.  And that statement I do not think was the cornerstone

16   for deciding that Ms. Cobat was not credible in this trial.  I

17   don't think that that had really any bearing on her

18   credibility.  It was the other overwhelming evidence that bears

19   on her credibility for purposes of the jury determining whether

20   she had the requisite intent to commit these crimes.  And I

21   think there is, and we've gone through in our motion, and we

22   have differing exhibits which shows she presented at almost

23   identical periods of time different information to both DHS and

24   to SSI about where she was living and who she was living with.

25   And I also want to point out, just because we talked

1    about how accurate the TRACS records were, she testified that

2    as of April 2012, she didn't believe she was receiving TANF

3    benefits anymore.  That's her defense.  But in October of 2012,

4    those same TRACS records show she contacted DHS and said, "Why

5    didn't I get more TANF?"

6          So to the extent she wants to say since April 2012,

7    "I hadn't been receiving TANF," the jury could have reviewed

8    TRACS records and seen, well, in October of 2012, she was

9    calling to ask about her TANF, so how can she say in April of

10   2012 she didn't receive TANF when she's asking why she didn't

11   receive more of it in October?

12         So I think there's plenty of other issues throughout

13   the TRACS narrative that point to also her lack of credibility.

14               THE COURT:  All right.  Thank you.

15               MR. AHLEMEYER:  I think if anything, the TRACS

16   narratives highlight the different mixed messages she's

17   getting.  She's talking to different representatives who would

18   then say, "Oh, no, you're not on TANF, you're still in the

19   pre-SSI," or "Pre-SSI ended and you're now in TANF."

20         So there's a give and take, and I think that would

21   have only supported the defense argument that the agency

22   representatives were communicating back and forth, and there is

23   a give and take, and there could be confusion and that she was

24   receiving mixed messages.

25               I do want to go back to the government highlighted

1  Exhibit 11.  This is a misstatement on it.  What they didn't

2  address is she said on that document, "Yes, I have been

3  convicted of a felony in the past year," which was untrue.  So

4  this is part of what we're talking about is on the very same

5  document she's making a statement that is clearly false that

6  the agency doesn't catch that would have meant she gets no

7  benefits.

8          So her confusion is important here, and you can't

9  just isolate one line and say, well, the jury would have

10  focused on that.  In any event, that was part of the defense is

11  that she was confused as to what "lives with" means, and that

12  gets fleshed out in her conversations with the representatives.

13  So that's why we think credibility is just incredibly important

14  here.  So --

15          THE COURT:  What's your additional argument on your

16  motion to dismiss?

17          MR. AHLEMEYER:  My primary argument that I wanted to

18  bring up is in response to the government's latest filing.  And

19  as I mentioned, I see the categories of *Brady* material in two

20  different ways, one focusing on the intent and the other on the

21  jurisdictional element.

22          And as the government cited in its own brief, one of

23  the factors the Court should look at is the government's

24  willingness to own up to the problems in this case and what has

25  happened, and that's something that I found a lot of

1    disagreements with their response.

2           And the first one I'll highlight is a very simple

3    one.  Although they dismissed Count 3, failure to have the

4    jurisdiction, they conclude the government did not commit a

5    *Brady* violation.  I mean, to me, as I highlighted earlier, I

6    think this is a 100 percent *Brady* violation.  There was

7    material that was not turned over that would have shown

8    Ms. Cobat could not be convicted of the crime she was convicted

9    of.  So that was the first thing that troubled me when I saw

10   that.

11          But probably more so was the government's assessment

12   of the timeline here.  And in their latest motion, on page

13   12 -- and I quote -- "After defense counsel said that he

14   believed the funds were not federally funded, the government

15   promptly reached out to DHS to verify the funding," citing to

16   the declaration.

17          The following page, page 13:  "As soon as the

18   government was made aware of this issue, it promptly

19   investigated and learned of the error."

20          Again citing to the declaration, paragraph 21 and 22,

21   the declaration says that the lead counsel did not learn -- on

22   January 23rd, 2018, lead counsel had a conference call with

23   me -- with the defense -- and during this conference call she

24   realized for the first time that the defense was questioning

25   whether the pre-SSI -- whether TANF or not -- was federally

funded.

I don't know what to make of that, because that's January 23rd.  On December 28th is when I filed the motion for a new trial.  And I clearly in that motion said:  "It is also not clear that the money Ms. Cobat received was derived from federal government funding, as required by 18 U.S.C. Section 641.  While there was testimony that traditional TANF is partly funded by the federal government, there was no evidence that the same was true for the pre-SSI/SSDI program."

And then my Exhibit C, which I had attached, suggests the opposite by repeatedly referencing that Ms. Cobat would need to repay the state for any benefits received.

I can't square that the government claims not to have known this was an issue a month after I made that point in my motion.  This is not a proper response.

And what did the government say?  They responded by saying my arguments were without merit, that reliance on the new exhibits is misplaced, that I misstate the law, and that these exhibits would have added nothing of substance to the trial and are neither material nor exculpatory and urge this Court to go ahead with sentencing and reject the motion summarily.

So I think that shows a high unwillingness to accept responsibility for what happened here, and I don't understand how it took the government a month to figure out that was my

1    argument.

2              And the last thing I'll say on this point, Your

3    Honor, is -- and this is perhaps naive, and maybe the

4    government is doing this anyway, but we have a very experienced

5    DHS investigator, who has been doing this for 23 years, we have

6    a very experienced benefits prosecutor, and nobody knew that

7    there was these subsets of TANF that are not federally funded?

8    And I hope that the government after this incident has gone to

9    DHS or any other agency and really tried to figure out what all

10   these subsets are and are they federally funded or not.

11             And the other thing I hope the government is doing as

12   a remedial measure is going back over any convictions in this

13   district or otherwise that are based on TANF funding, and

14   making sure that it wasn't pre-SSI, because we all know with

15   the high rate of plea agreements and, you know, defendants who

16   will plead is in the upper 90s percentile, that would be

17   something I'd be very concerned about if I were the government.

18             So those are remedial actions, you know, falling on

19   their sword, recognizing this was a *Brady* violation, and taking

20   steps to remedy that are all things that I see missing in their

21   response, and I think that's very important for the Court to

22   consider in evaluating whether or not to exercise its

23   supervisory power.

24             THE COURT:  Thank you.

25             Go ahead.

1        MS. POTTER:  Your Honor, I'll just start with there

2    is a lesson here, and it's certainly a lesson that's getting

3    carried back to the office, which is we're going to

4    check-double check the responses for 641 in any case where we

5    have these jurisdictional elements.  It happens.  We're focused

6    on, and what we say in closing is nothing is really in dispute

7    here except the intent, and that's what everything focused on.

8    So that lesson, that message is sent.

9        THE COURT:  Prospectively and retroactively or just

10   prospectively?

11       MS. POTTER:  Prospectively at this point.  I will

12   certainly carry back this issue.  I will say that you can't

13   receive TANF benefits without some of these other benefits also

14   occurring, so most of the convictions, I would say,

15   percentage-wise are based on an SSI, and TANF is something that

16   is added on.  The significant benefits typically involved are

17   SSI or sometimes SNAP, but really these cases start as Social

18   Security benefits.  And I'm not aware -- I'm not claiming to

19   know everything, but I'm not aware of a solely TANF case that

20   has ever been prosecuted by our office.

21       THE COURT:  That assumes that if someone is convicted

22   of Social Security fraud, they really just shouldn't care that

23   they also improperly got convicted of a TANF case, two counts

24   instead of one, or two counts instead of three.  So I think

25   it's worth a look.

1    MS. POTTER:  Certainly, Your Honor, and I will

2  absolutely look.  And I didn't mean to imply they shouldn't

3  care about that.  Obviously I can understand how it would be

4  concerning.  My point was only that I hope that it's a very

5  narrow or small range of cases.  And we will check that.

6    THE COURT:  Was there a *Brady* violation in this case?

7    MS. POTTER:  I don't believe there was a *Brady*

8  violation because the violation -- and I understand that the

9  Court has found it was material and it was suppressed, and the

10  prejudice has been remedied.  So typically when the Court is

11  looking at was there prejudice, we're talking about someone who

12  has been convicted and the conviction stands.  She's no longer

13  convicted of this count.

14    So the reason we don't say there's a *Brady* violation

15  is because we took the measure, the steps to vacate the

16  conviction.  And so that is the reason.  There's three prongs

17  to *Brady*.  I understand it's material, and we acknowledge --

18    THE COURT:  So there was prejudice, you've just cured

19  the prejudice.  She did get convicted.

20    MS. POTTER:  To the extent the Court has ruled that

21  we suppressed the evidence regarding the source of the funding,

22  then yes, that was --

23    THE COURT:  What's your argument that you did not

24  suppress the evidence regarding the source of the funding?

25    MS. POTTER:  I think the Court has rejected my

1    argument that the defense attorney could have requested and

2    asked for that same information.  I'm not trying to reargue

3    that, Your Honor, I'm just saying that that was the argument we

4    made, and that frankly there's no need to make a specific

5    finding of *Brady* violation because we've dismissed Count 3.

6              In terms of the complaint about the motion, the focus

7    with the first new trial memo appeared to be, as I interpreted

8    it, that she wasn't receiving TANF, and that whatever benefits

9    she was receiving -- I understand there was -- whatever

10   benefits she was receiving was not federally funded.

11             So the focus of the response to that motion was to

12   determine whether it was TANF, and the same mistake that was

13   made in the beginning was made again, which is that TANF is

14   generally federally funded, we have proven that these benefits

15   were TANF, and let's respond and let's explain to the Court

16   that she did receive TANF.

17             THE COURT:  You've avoided your opponent's argument

18   by defining the focus of his memo in a way that doesn't include

19   an argument he made.

20             MS. POTTER:  Well --

21             THE COURT:  I mean, his memo in December specifically

22   included an argument that the federal jurisdictional amount was

23   at least unclear, right?  That's not a question of interpreting

24   what he was arguing.  It's right there in print, isn't it?

25             MS. POTTER:  Yes, but to the extent he's trying to

1   imply nefarious actions by the government or a failure to

2   follow up --

3            THE COURT:  I think the argument is that he made an

4   argument about federal jurisdiction and that argument sort of

5   got the back-of-the-hand treatment.

6            MS. POTTER:  I don't think it got the back of the

7   hand.  I think it wasn't fully understood and thus it was not

8   followed up on.  When it became clear to everyone involved, it

9   was followed up on and the count was dismissed.  Would it have

10  been better to do it earlier?  Absolutely, Your Honor, but I

11  don't think that this warrants dismissal of this indictment.

12           THE COURT:  So I've tried to think about the case in

13  terms of withheld documents on the one hand and testimony and

14  argument on the other, because it's, I think, nearly impossible

15  to apply *Raley* to the latter.  It just doesn't apply because

16  you can't know prior to trial how you're going to access, you

17  know, an improper closing argument or something like that, and

18  so I just find really inapplicable to a new trial motion

19  grounded in the idea that there was either false testimony at

20  trial or improper argument based on something that shouldn't

21  have happened.

22           And so as to the nonproduced documents, there is

23  pending a serious question about whether it was suppressed that

24  I'm going to allow the parties to submit briefing on one week

25  from today, simultaneously, on whether *Raley* is good law or not

1  as to the three categories of documents I've identified in this
2  case that are the subject of defendant's motion.
3          As to the withheld documents in Count 3, we already
4  know the answer.  If I haven't done so already, I formally
5  grant the government's request to dismiss Count 3.
6          And as to the improper closing argument, in my view,
7  and in my view the improper testimony of Ms. Austin, which I
8  read as -- combined with how it was used at trial, I read that
9  as a way of improperly proving to the jury a receipt of more
10 than a thousand dollars of federally funded TANF benefits.
11 That makes that testimony false, and I've tried to apply the
12 law about false testimony, *Mooney*, you know, to some extent
13 *Brady* and new trial issues, and I am clear in my mind today
14 that there is a taint that radiates out from Count 3, at least
15 as to Count 1, on that evidence.  I can't have confidence that
16 I -- that the jury would do the same thing as to Count 1
17 with -- or that that didn't create a problem with Count 1,
18 because Count 1 essentially incorporates Count 3, at least in
19 part.
20         So I view that as a count that has to fall for many
21 of the same reasons that the government chose to dismiss Count
22 1, along with the ones I've expressed, that the jury's
23 reasoning as to Count 1 would, by my own jury instruction to
24 them, have necessarily included consideration of this improper
25 testimony and argument.

1        And what I do with Counts 2 and 4 depends a little

2   bit on what I do with suppression or not, the suppression

3   question or not.  So I'm going to wait and take under

4   advisement Counts 2 and 4, along with the motion to dismiss.

5        So, as I said, simultaneously, one week from today,

6   I'll receive from you your briefing on *Raley*, and I'll make a

7   further decision as to Counts 2 and 4 at that time.

8        We have Exhibit A.  I'll return it to you,

9   Mr. Ahlemeyer, and that is a part -- I'm going to allow that to

10  be a part of your *Raley* briefing, you know.  I mean, it's the

11  argument that *Raley* shouldn't apply in cases where the

12  defendant reaches out to try to get the documents and can't get

13  them.  So I'll return that to you, but the government now has

14  it, and I don't want to have new discovery and new evidence at

15  this point, but to the degree that the parties want to try to

16  explain to me better than I now know what Exhibit A is all

17  about, you're free to do so in your briefing, and I'll try to

18  figure out whether that's really what happened or not.

19       So, Ms. Scheele, can you give us a time -- actually,

20  one week precisely from today, I'm actually in Eugene.  So it's

21  either Thursday or the following Monday, I guess.

22       Do you have a preference, Ms. Potter?

23       MS. POTTER:  I'm sorry?

24       THE COURT:  Just for submission of the documents.

25       MS. POTTER:  I would prefer Monday, Your Honor.

1          THE COURT:  All right.  So we'll have it submitted on

2   Monday, because I won't get to it on Friday anyway.  That will

3   give you the extra day.  So submit it by close of business on

4   Monday.

5          THE CLERK:  The 16th.

6          THE COURT:  The 16th.

7          Thank you all.  We'll be in recess.

8          THE CLERK:  Court is in recess.

9          (Proceedings concluded.)

1

2                                    --o0o--

3

4          I certify, by signing below, that the foregoing is a

5   correct transcript of the record of proceedings in the

6   above-entitled cause.  A transcript without an original

7   signature or conformed signature is not certified.

8

9

10  /s/Bonita J. Shumway                April 10, 2018
    _____            _____
11  BONITA J. SHUMWAY, CSR, RMR, CRR    DATE
    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25